APPEL, Justice
(specially concurring).
I join in the majority opinion, but write to review the foundations of the well-established Iowa law that we jealously reserve our right to construe our state constitution independently of decisions of the United States Supreme Court interpreting parallel provisions of the Federal Constitution.
I. Historic Role of State Constitutions.
A. State Constitutions, Declarations of Rights, and Judicial Review Prior to Ratification of United States Constitution. Suppose a leading historian asks you to identify a period in American history. The historian tells you the period in question was “the most creative and significant period of constitutionalism in modern Western history.” The historian further advises you that many able and dedicated persons were drawn away from their other important political responsibilities to engage in legal drafting. Finally, the historian advises you that the end work product of those who labored “captured the attention of intellectuals everywhere in the world” and was “published and republished in several European languages.” With these three clues, you might be tempted to answer that the period being described is the several months in 1787 when the delegates to the Constitutional Convention in Philadelphia drafted the United State Constitution. But you would be wrong.
The above description is based on the writing of Gordon Wood, a leading historian of the Revolutionary Era and the Early Republic. He was writing with such panache not about the Constitutional Convention in Philadelphia, but about the period beginning in 1776 when states began the process of drafting their own independent state constitutions. See Gordon S. Wood, Foreword: State Constitution-Making in the American Revolution, 24 Rutgers L.J. 911, 911, 913-14 (1993) [hereinafter Wood].
While the Philadelphia convention and its aftermath have greater notoriety today, the construction of independent state constitutions was an important legal development. More than a decade before the Constitutional Convention in Philadelphia, *804 the Continental Congress in May 1776 encouraged the establishment of state governments with “all the powers of government exerted, under the authority of the people of the colonies.” See Jack Rakove, The Beginnings of National Politics: An Interpretative History of the Continental Congress 96-97 (1979); Merrill Jensen, The Articles of Confederation: An Interpretation of the Social-Constitutional History of the American Revolution 1771-1781 98 (1948); see also TV Journals of the Continental Congress, 177⅛-1789 358 (Worthington C. Ford et ah, ed. 1904-87) [hereinafter Journals of the Continental Congress]. A few weeks later, the Declaration of Independence declared that “these United Colonies are, and of Right ought to be Free and Independent States.” The Declaration of Independence para. 32 (U.S. 1776). By the time of the Declaration, the states had already begun to develop their structures, including their constitutions. Edmund S. Morgan, The Birth of the Republic, 1763-89 88-89 (3d ed. 1992) [hereinafter Morgan]; Wood, 24 Rutgers L.J. at 913. John Adams, George Mason, James Madison, John Jay, and Gouverneur Morris, among others, participated in the drafting of these state constitutions. I Melvin Urof-sky & Paul Finkelman, A March of Liberty: A Constitutional History of the United States 66, 69-70 (2d ed. 2011).
Thus, upon declaring independence, the people did not return to a Hobbesian state of nature. Rather, the prior colonial governments evolved into “Independent States” through a constitutional process. By the end of 1776, ten state governments were in place, with the rest being completed in 1780. Morgan at 90; Wood, 24 Rutgers L.J. at 913-14. From the get-go, these state constitutions were designed to be stand alone sources of law. As noted by Fletcher M. Green, the colonialists debated extensively in the months preceding independence whether the states should adopt a uniform constitution, to be prepared by the Continental Congress. Fletcher M. Green, Constitutional Development in the South Atlantic States, 1776-1860: A Study in the Evolution of Democracy 52-54 (W.W. Norton & Co. 1966) [hereinafter Green]. Ultimately, following the proposal of John Adams, the Continental Congress recommended that the states form their own constitutions that “ ‘in the opinion of representatives of the people, best conduce to the happiness and safety of their constituents in particular, and America in general.’ ” Id. at 54 (quoting IV Journals of the Continental Congress at 342); see also Willi Paul Adams, The First American Constitutions: Republican Ideology and the Making of State Constitutions in the Revolutionary Era 55-56 (Rita & Robert Kimber trans., Madison House Books, expanded, ed. 2001) (describing Adams’s reasoning in recommending to New Hampshire that it form its own government). Thus, the colonialists expressly rejected uniformity. Green at 54.
The approval of the Articles of Confederation did not alter the status of state constitutions as independent sources of law. The constitutions of what the Declaration of Independence called “Independent States” coexisted with the Articles of Confederation. Under the Articles of Confederation, the states, not the people, were represented in the Congress. John P. Kaminski, The Constitution Without a Bill of Rights, in The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties 16, 18 (Patrick T. Conley & John P. Kaminski eds., 1992) [hereinafter Kaminski], Article II of the Articles of Confederation structured the relationship between the states and the “United States, in Congress assembled.” See Articles of Confederation of 1781, art. II. It provided, “Each state *805 retains its sovereignty, freedom, and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled.” Id.
By the time of the Constitutional Convention in Philadelphia, eleven states had written constitutions (Connecticut and Rhode Island continued governance under modified colonial charters). Ralph Ketch-am, Introduction, in The Anti-Federalist Papers and the Constitutional Convention Debates 1, 3 (Ralph Ketcham ed., 1986) [hereinafter Ketcham]; Advisory Commission on Intergovernmental Relations, State Constitutions in the Federal System 7 (1989) [hereinafter State Constitutions in the Federal System]; see also generally Albert L. Sturm, The Development of American State Constitutions, 12 Publius 57, 60-63 (1982). This state constitutional experience was recognized by Thomas Jefferson, who is said to have calculated that by 1787 the states collectively shared 150 years of experience in republican government. Ketcham at 3. As a result, when the conclave opened in Philadelphia, there was already a mature state constitutional tradition upon which the founders could draw. Donald S. Lutz, The Origins of American Constitutionalism 5 (1988).[5] Thus, the United States Constitution was not created by some kind of legal Big Bang, but instead was the outgrowth of colonial experience and state constitutional precedents.
Many of these early independent state constitutions had declarations of rights or similar provisions. See 1 Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses, § 1.03[1], at 1-7 to 1-10 (4th ed. 2006) [hereinafter Friesen]. Eight of these early state constitutions (Virginia, Pennsylvania, Delaware, Maryland, North Carolina, Vermont, Massachusetts, and New Hampshire) had search and seizure provisions. Bernard Schwartz, The Great Rights of Mankind: A History of the American Bill of Rights 88 (Madison House 1992) [hereinafter Schwartz]. Of particular interest is the Massachusetts search and seizure provision. This important search and seizure provision was drafted by John Adams, who as a young lawyer was thrilled to hear James Otis rail in Paxton’s case against the new writs of assistance issued by the English crown. See, e.g., Leonard W. Levy, Origins of the Bill of Rights 157-59 (1999) [hereinafter Levy]; John M. Mur-rin, From Liberties to Rights: The Struggle in Colonial Massachusetts, in The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties 63, 88-91, 94 (Patrick T. Conley & John P. Kaminski eds., 1992) [hereinafter Murrin], Adams’s experience influenced the text of the provision. Levy at 158; Murrin at 91. It states:
Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in *806 suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.
Mass. Const, of 1780, art. XIV.
In contrast to many of the Revolutionary Era state constitutions, the Articles of Confederation had no bill of rights. Under the Articles of Confederation, however, Congress had no power over individuals and only limited authority with respect to the states. Kaminski at 18. Thus, there arguably was no need for a bill of rights as Congress had no direct authority over the people. Id.
In addition, state court judges operating under Revolutionary Era state constitutions were developing the principle of judicial review in a series of state constitutional cases decided before ratification of the United States Constitution and Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). On several occasions, state courts ruled state statutes purporting to limit the right to jury trials were unconstitutional. For example, in the 1780 New Jersey case of Holmes v. Walton, an unpublished decision, the court found a statute permitting trial by a six-man jury unconstitutional under the New Jersey Constitution. Schwartz at 95; see also State v. Parkhurst, 9 N.J.L. 427, 444 (1802) (describing that “the act upon solemn argument [in Holmes ] was adjudged to be unconstitutional, and in that case inoperative”). In 1786 and 1787, New Hampshire courts found unconstitutional an act providing that certain actions for damages totaling less than ten pounds could be tried by a justice of the peace without a jury. William Michael Treanor, Judicial Review Before Marbury, 58 Stan. L. Rev. 455, 475-76 & n. 83 (2005). In the unreported Rhode Island case Trevett v. Weeden, the Rhode Island Supreme Court struck down a law passed in 1786 that imposed a penalty, without requiring a jury trial, on those who did not accept the state’s paper money in place of gold and silver. Id. at 476-78. In Bayard v. Singleton, 1 N.C. (Mart.) 5 (1787), the North Carolina Supreme Court concluded a statute barring loyalists from challenging the state’s seizure of their property was unconstitutional because the North Carolina Constitution provided for a jury trial whenever property was at issue in a legal dispute. Treanor, 58 Stan. L. Rev. at 478-79. These pre-Marbury cases expanded to other areas of the law. For example, in 1784 the New York City Mayor’s Court held a statute could not override a treaty or international law in Rutgers v. Waddington, also unreported. Schwartz at 97. See generally Treanor, 58 Stan. L. Rev. at 480-87. To arrive at this conclusion, the court noted New York’s constitution adopted the common law and, therefore, the law of nations. Treanor, 58 Stan. L. Rev. at 483. In what has become known as the “Case of the Prisoners,” reported as Commonwealth v. Caton, 8 Va. (4 Call) 5 (1782), a number of Virginia judges embraced judicial review in finding certain pardons unconstitutional. See William Michael Treanor, The Case of the Prisoners and the Origins of Judicial Review, 143 U. Pa. L. Rev. 491 (1994).
Three points emerge from the above discussion. First, prior to the ratification of the United States Constitution, state constitutions, the first American constitutions, were independent sources of law. Second, many of the independent state constitutions, unlike the Articles of Confederation, had bill-of-rights-type provisions designed to restrain arbitrary government action, including provi *807 sions related to government search and seizure. Finally, at least some state courts were developing the principle of judicial review under their state constitutions decades prior to Marbury v. Madison.
B. The Impact of Ratification and Adoption of the Bill of Rights of the United States Constitution on Independent State Constitutional Law. The
United States Constitution was not designed to obliterate the states and their preexisting constitutions, but to instead draw them into a federal system with many of their functions largely intact. As noted by Herbert Wechsler in the first sentence of his seminal law review article, maintenance of the state’s residual sovereignty was the “means and price of the formation of the Union.” Herbert Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev. 543, 543 (1954).
Of course, the proposed United States Constitution imposed important limitations on the states. Federal law would prevail over state law under the Supremacy Clause.[6] U.S. Const, art. VI, cl. 2. The Guarantee Clause provided that the United States “shall guarantee” that every state has a “Republican Form of Government.” Id. art. IV, § 4. Further, Article I, Section 10 prohibited states from entering into treaties, alliances or confederations, from coining money, from laying imposts or duties on imports or exports except to an extent necessary to execute inspection laws, from maintaining armies during times of peace, from entering into alliances with foreign states, from engaging in war unless actually invaded, and from enacting certain kinds of legislation, such as bills of attainder, ex post facto laws, and laws impairing the right of contracts. Id. art. I, § 10.
Although the draft United States Constitution contained a number of provisions related to civil liberties,[7] founders at the Constitutional Convention in Philadelphia did not consider whether to include a bill of rights in the proposed constitution until five days from the end of the convention. Richard Labunski, James Madison and the Struggle for the Bill of Rights 9 (2006) [hereinafter Labunski], George Mason, who was largely responsible for the Declaration of Rights in the Virginia Constitution, and Elbridge Gerry of Massachusetts proposed that a committee be appointed to draft bill of rights provisions to be incorporated into the Federal Constitution. Id. at *808 8-12; see also Robert Allen Rutland, The Birth of the Bill of Rights 1776-1791 112-13 (1955) [hereinafter Rutland]. One scholar has suggested the convention decided not to include a bill of rights perhaps out of fatigue as much as anything else. Labunski at 9.
Overall, however, the founders looked to the states to protect individual liberties. At the Constitutional Convention, James Wilson observed that the purpose of the states was “to preserve the rights of individuals.” I Records of the Federal Convention of 1787 356 (Max Farrand ed., 1937). Similarly, in Federalist No. 45, Madison stressed that under the Constitution, “The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people.... ” The Federalist No. ⅛5, at 236 (James Madison) (Garry Wills ed., 1982). Madison repeated the liberty theme in Federalist No. 51 by declaring, “In the compound republic of America, the power surrendered by the people, is first divided between two distinct governments.... Hence, a double security arises to the rights of the people.” The Federalist No. 51, at 264 (James Madison) (Garry Wills ed., 1982) (emphasis added).
Notwithstanding Madison’s efforts, anti-federalists made much hay over the failure of the Constitution to ensure in more specific language that the power of states would be preserved. See Pauline Maier, Ratification: The People Debate the Constitution, 1787-1788 86-95 (2010) [hereinafter Maier]. As noted above, the Articles of Confederation expressly reserved all powers except those specifically enumerated to the states. Opponents of the Constitution wondered why such a provision was omitted from the proposed United States Constitution. See, e.g., id. at 90-92.
In addition, opponents to the Constitution asked why the framers failed to include a bill of rights. See, e.g., id. at 44, 87. Opponents noted that many state constitutions contained a bill of rights, and they wondered why a similar approach was not taken in the United States Constitution. Id. at 44 (citing views of George Mason). The response of the supporters of the Constitution that the federal government was one of enumerated powers and that a bill of rights was therefore unnecessary was unpersuasive to many. Id. at 79.
While proponents of the Constitution were able to obtain unconditional ratification of the Constitution, their success was in part obtained by agreeing to a process in which future curative amendments to the Constitution would be considered. See, e.g., Kaminski at 25-38 (providing overview of ratification process, in which seven states, including Massachusetts, Virginia, and New York, ratified the Constitution and proposed amendments); Maier at 192-98 (describing the striking of a deal between the Federalists and John Hancock that included proposing future amendments to the Constitution at the first meeting of Congress and political support for Hancock in future elections). Relying in part on the rights provisions of the Massachusetts and Pennsylvania Constitutions, Madison drafted and Congress proposed amendments to the ratified United States Constitution that came to be known as the Bill of Rights. See, e.g., Levy at 35-43; Rutland at 202.
The addition of the Bill of Rights to the United States Constitution did not affect the independent nature of state constitutional provisions related to civil liberties. Under the Tenth Amendment, “powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” U.S. Const, amend. X. *809 Plainly, the United States Constitution does not delegate the judicial power to provide final, authoritative interpretation of state constitutions. And while there are many provisions of the United States Constitution limiting the power of states, there are no provisions prohibiting or restricting the power of state courts to interpret authoritatively their state constitutions. See State v. Schwartz, 689 N.W.2d 430, 438 (S.D.2004) (Konenkamp, J., concurring) (citing Tenth Amendment in finding that state supreme court had an obligation to decide whether the South Dakota Constitution required stricter standards for search and seizure than required by the United States Constitution).
The new amendments to the United States Constitution created a Federal Bill of Rights. These provisions were not originally thought to apply against the states. The issue was confronted in Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 250-51, 8 L.Ed. 672, 675 (1833), when the strongly nationalistic Chief Justice John Marshall wrote for the United States Supreme Court that the provisions of the Federal Bill of Rights did not apply against the states. Chief Justice Marshall wrote, “Each state established a constitution for itself, and in that constitution, provided such limitations and restrictions on the powers of its particular government, as its judgment dictated.” Id. at 247, 8 L.Ed. at 674. Thus, the Federal Bill of Rights did not supplant the state constitutional provisions upon which it was patterned, nor did it trump the provisions of state constitutions adopted after its enactment.
The result of Barron was “that state protections of liberty were more relevant to most people than the protections in the federal Bill of Rights.” Paul Finkelman & Stephen E. Gottlieb, Introduction: State Constitutions and American Liberties, in Toward a Usable Past: Liberty Under State Constitutions 9 (Paul Finkelman & Stephen E. Gottlieb eds., 1991). As noted by Chief Justice Cady,
Our Iowa Constitution, like other state constitutions, was designed to be the primary defense for individual rights, with the United States Constitution Bill of Rights serving only as a second layer of protection, especially considering the latter applied only to actions by the federal government for most of our country’s history.
Mark S. Cady, A Pioneer’s Constitution: How Iowa’s Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil Rights and Civil Liberties, 60 Drake L.Rev. 1133, 1145 (2012).
At the time of the adoption of the current Iowa Constitution in 1857, Barron was good law. As a result, the Iowa Constitution contains a number of provisions, including article I, section 8, Iowa’s search and seizure provision, which are designed to protect individual liberties against encroachment by state officials. See generally Iowa Const, arts. I — II. While contemporary sources related to the Iowa Constitutional Convention are limited, there is no reason to conclude the framers of the Iowa Constitution expected that article I, section 8 would receive a cramped interpretation. They placed the Iowa Bill of Rights at the beginning of the Iowa Constitution to emphasize its importance. State v. Ochoa, 792 N.W.2d 260, 274 (Iowa 2010). This priority placement has led one observer to declare that, more than the United States Constitution, the Iowa Constitution “emphasizes rights over mechanics.” Donald P. Racheter, The Iowa Constitution: Rights over Mechanics, in The Constitutionalism of American States 479, 479 (George E. Connor & Christopher W. Hammons eds., *810 2008). Further, George Ellis, Chairman of the Committee on the Preamble and Bill of Rights, stated the committee wanted provisions in the Iowa Bill of Rights that “would enlarge, and not curtail the rights of the people” and would “put upon record every guarantee that could be legitimately placed there in order that Iowa ... might ... have the best and most clearly defined Bill of Rights.” 1 The Debates of the Constitutional Convention of the State of Iowa 100 (W. Blair Lord rep., 1857). The committee did not consider itself some kind of Committee on Constitutional Redundancy and Duplication. Like the drafters of Revolutionary Era state constitutions that predated the United States Constitution, the Iowa founders considered the development of independent state constitutional rights as serious business.
In sum, the ratification of the United States Constitution and the subsequent adoption of the Bill of Rights had no impact on the status of state constitutions as an independent source of law. Moreover, the drafters of the Iowa Constitution were well aware of this basic feature of the federalist system when they fashioned the independent civil liberties provisions of the Iowa Constitution of 1857.
C. Impact of the Civil War Amendments on Independent State Constitutional Law. The passage of the Thirteenth, Fourteenth, and Fifteenth Amendments after the Civil War significantly altered the relationship between the federal government and the states. In particular, unlike most of the provisions of the original Bill of Rights in the United States Constitution, the Equal Protection, Due Process, and Privileges and Immunities Clauses of the Fourteenth Amendment expressly applied against the states. See U.S. Const, amend. XIV, § 1.
Like the passage of the Bill of Rights, the enactment of the Civil War Amendments did not alter state constitutions as an independent source of law. Instead, they simply provided a federal overlay to the state constitutional regime recognized by Chief Justice Marshall in Barron. As noted by Michigan Supreme Court Justice Thomas Cooley shortly after the Civil War, each state had the power to determine for itself what provisions are in its state constitution and “what protection shall be thrown around the person or property of the citizen.” Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 88 (Legal Classics Library 1987) (1868).
After the Civil War, the Iowa Supreme Court recognized its independent authority to construe the state constitution. In McClure v. Owen, 26 Iowa 248, 255 (1868), we declared:
It does not require argument to show that the ... same principles that require the federal courts to follow the decisions of the State courts in construing statutes, and to recognize rules of local law, require the federal courts to follow the construction given the Constitution by the highest State tribunal. There is no distinction that warrants the disregard of the rule in cases involving the construction of the State Constitution.
On questions of human rights, Iowa courts have traditionally demonstrated a remarkably broad vision. In In re Ralph, 1 Morris 1, 7 (1839), the Territorial Supreme Court rejected a claim that a slave present in a free state should be returned to his master, noting that under Iowa law a slave within the free territory of Iowa is not “property” and that the laws regarding illegal restraint apply “to men of all colors and conditions.” While not based on the yet unadopted Iowa Constitution, the *811 broad reasoning, tone, and attitude toward equality in In re Ralph stands in striking contrast to the disastrous majority opinion of the United States Supreme Court nearly two decades later in Dred Scott v. Sanford, 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1857).
In Clark v. Board of Directors, 24 Iowa 266 (1868), we rejected the argument that a school district could forbid African American children from attending a school with whites on grounds of race. In Clark, our interpretation of applicable statutes was driven by a broad conception of article IX, section 12 of the Iowa Constitution, which requires the education of “all the youths of the State.” Id. at 274-77. In Coger v. Northwest Union Packet Co., 37 Iowa 145 (1873), we rejected the notion that African Americans could be subjected to different treatment when being transported by public earners. In reaching this far-sighted conclusion, we cited article I, section 1 of the Iowa Constitution, which declares, “All men are, by nature, free and equal,” and noted that “[ujpon it we rest our conclusion in this case.” Id. at 153-55. These Iowa equality cases have little in common with the majority opinion of the United States Supreme Court in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and much more in common with the powerful dissent by Justice John Marshall Harlan, id. at 555-64, 16 S.Ct. at 1145-48, 41 L.Ed. at 262-65 (Harlan, J., dissenting).
The independent Iowa constitutional tradition was repeatedly recognized in the first half of the twentieth century. In State v. Height, 117 Iowa 650, 654-55, 91 N.W. 935, 938 (1902), we held as a matter of state constitutional law that the privilege against self-incrimination was incorporated in the due process clause of article I, section 9 of the Iowa Constitution even though at the time the United States Supreme Court did not incorporate the Fifth Amendment against the states pursuant to the Due Process Clause of the Fourteenth Amendment. Then, in McCollum v. McConaughy, 141 Iowa 172, 176, 119 N.W. 539, 540-41 (1909), we noted that, although we followed the United States Supreme Court’s pronouncements on questions of federal constitutional law, in our construction of a parallel state constitutional provision, “[w]e are not bound ... by any obligation imposed upon us in the federal Constitution to uphold a State statute merely because, in the view of the Supreme Court of the United States, it is not unconstitutional.”
The responsibility of this court to exercise independent judgment under the Iowa Constitution was well illustrated in State v. Tonn, 195 Iowa 94, 191 N.W. 530 (1923). In Tonn, we considered whether holdings by the United States Supreme Court in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), under the Fourth and Fifth Amendments of the United States Constitution should be followed under parallel provisions of the Iowa Constitution. Tonn, 195 Iowa at 104, 191 N.W. at 535. In Boyd, the United States Supreme Court held that the forced production of business papers absent probable cause and their admission at a subsequent hearing “were erroneous and unconstitutional proceedings.” 116 U.S. at 638, 6 S.Ct. at 536-37, 29 L.Ed. at 754. Using a methodology anticipating our approach in State v. Cline, 617 N.W.2d 277 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001), State v. Ochoa, 792 N.W.2d 260 (Iowa 2010), and State v. Pals, 805 N.W.2d 767 (Iowa 2011), the majority in Tonn noted that the decision of the United States Supreme Court in Boyd “give[s] us pause” and then proceeded to canvas academic authorities, authorities in other states, and dissenting *812 federal eases in concluding the approach of the United States Supreme Court in Boyd should no longer be followed in Iowa. Tonn, 195 Iowa at 103-09, 191 N.W. at 534-36 (internal quotation marks omitted). In Cline, we rejected Tonn, holding the “good faith exception” to the exclusionary rule was incompatible with article I, section 8 of the Iowa Constitution. Cline, 617 N.W.2d at 292-93. Nonetheless, the approach in Tonn shows judicial recognition in Iowa of this court’s responsibility to engage in independent constitutional analysis of state constitutional provisions that parallel federal constitutional provisions.
Clearly, the Civil War Amendments to the United States Constitution did not supplant the provisions of the Iowa Bill of Rights. Our remarkable legal heritage demonstrates that construction by the United States Supreme Court of a parallel provision of the United States Constitution does not bind our court on issues under the Iowa Constitution. Independent state constitutional analysis is nothing new, but has been long recognized in Iowa law.
D. Incorporation of the Bill of Rights Through the Due Process Clause. Beginning in 1925, the United States Supreme Court incorporated provisions of the Bill of Rights of the United States Constitution against the states under the Due Process Clause of the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1145 (1925) (stating freedoms of speech and press are so fundamental that they are protected from state interference under the Due Process Clause). For the Fourth Amendment, this process began with Wolf v. Colorado, 338 U.S. 25, 27-28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782, 1785-86 (1949), and was extended by Mapp v. Ohio, 367 U.S. 643, 660, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081, 1093 (1961). Nothing in the Supreme Court’s incorporation doctrine as it related to the Fourth Amendment altered the independent nature of state constitutional provisions related to search and seizure. Instead, incorporation of the provisions of the Bill of Rights of the United States Constitution against the states through the Due Process Clause of the Fourteenth Amendment established a federal floor related to civil liberties.
While incorporation was a major constitutional advancement, Justice John Marshall Harlan II was concerned that the nationalization of the Bill of Rights’ protections would lead to a substantive dilution of those protections.[8] See Patrick E. *813 Higginbotham, The Continuing Dialogue of Federalism, 45 U. Kan. L. Rev. 985, 988-91 (1997). In the search and seizure-case of Ker v. California, 374 U.S. 23, 46, 83 S.Ct. 1623, 1646, 10 L.Ed.2d 726, 745 (1963) (Harlan, J., concurring), Justice Harlan wondered whether the United States Supreme Court “[was] prepared to relax Fourth Amendment standards in order to avoid unduly fettering the States.” A few years later, Justice Harlan saw “a major danger of the ‘incorporation’ approach — that provisions of the Bill of Rights may be watered down in the needless pursuit of uniformity.” Duncan v. Louisiana, 391 U.S. 145, 182 n. 21, 88 S.Ct. 1444, 1466 n. 21, 20 L.Ed.2d 491, 514 n. 21 (1968) (Harlan, J., dissenting). In his dissent in Williams v. Florida, 399 U.S. 78, 136, 90 S.Ct. 1893, 1925, 26 L.Ed.2d 446, 474 (1970) (Harlan, J., dissenting), Justice Harlan noted that the decision to establish a six person jury “simply reflects the lowest common denominator in the scope and function of the right to trial by jury in this country.” Finally, in a draft concurrence to Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), and Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), that was never filed because of his intervening death, Justice Harlan wrote that incorporation threatened “ ‘to chill the Sixth Amendment out of existence’ and ‘might well spell the demise — under the inescapable pressures of federalism — of many other provisions of the Bill of Rights.’ ” Tinsely E. Yarbrough, John Marshall Harlan: Great Dissenter of the Warren Court 291 (1992) (internal quotation marks omitted).
In the period following the incorporation revolution ending with Mapp, there is no doubt the strength and scope of the Fourth Amendment’s protection has been dramatically reduced by the United States Supreme Court. Pre-Mapp, there were a couple exceptions to the warrant requirement; post-Mapp there are nearly two dozen such exceptions. California v. Acevedo, 500 U.S. 565, 582-83, 111 S.Ct. 1982, 1992-93, 114 L.Ed.2d 619, 636 (1991) (Scalia, J., concurring). The role of consent has been changed from its narrow characterization in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), to its protean formulation in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The strength of the exclusionary rule in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), has been substantially eroded by the “good faith exception” to the exclusionary rule. See United States v. Leon, *814 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
As a result, in implicit recognition of the difficulties arising from incorporation of the Bill of Rights into a national system of rules, the post-incorporation United States Supreme Court has repeatedly emphasized the ability of states to expand the scope of constitutional protections under their state constitutions. See, e.g., California v. Greenwood, 486 U.S. 35, 48, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30, 39 (1988) (“Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution.”); Michigan v. Mosley, 423 U.S. 96, 120, 96 S.Ct. 321, 334, 46 L.Ed.2d 313, 331 (1975) (Brennan, J., dissenting) (calling on states “to impose higher standards governing police practices under state law than [are] required by the Federal Constitution”); Oregon v. Hass, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 575 (1975) (repeating that “a State is free as a matter of its own law to impose greater restrictions ... than those this Court holds to be necessary upon federal constitutional standards” (emphasis added)); Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967) (noting that Supreme Court holding “does not affect the State’s power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so”). See generally Shirley S. Abrahamson, Criminal Law and State Constitutions: The Emergence of State Constitutional Law, 63 Tex. L. Rev. 1141, 1142 n. 3 (1985) [hereinafter Abrahamson] (discussing cases). In 2008, Justice Scalia observed in Virginia v. Moore, 553 U.S. 164, 176, 128 S.Ct. 1598, 1607, 170 L.Ed.2d 559, 571 (2008), that “States are free to regulate [warrantless] arrests however they desire.”
Cumulatively, the realities in the post-incorporation era were as follows: the United States Supreme Court incorporated most of the Bill of Rights provisions of the United States Constitution against the states through the Due Process Clause of the Fourteenth Amendment, but as a result, federalism concerns exerted a new narrowing and restraining influence on the interpretation of federal civil liberties provisions. In the post-incorporation era, the United States Supreme Court repeatedly emphasized the ability of states to adopt more stringent protections under state constitutions.
II. Status of Independent State Constitutional Law Today After Incorporation of the Bill of Rights.
A. Rebirth of Independent State Constitutional Law. After incorporation, many state courts tended to follow or adopt the approach of the United States Supreme Court in interpretation of parallel provisions under state constitutions. This tendency to simply follow federal caselaw was in part due to the fact that federal law was more expansive than prior state constitutional law. Lawyers also often relied solely on federal constitutional law or regarded state and federal law as interchangeable in their advocacy in state courts. See State Constitutions in the Federal System at 49.
Beginning in the 1960s, however, a growing number of states began to rediscover the independent nature of their state constitutional provisions. Sometimes called the “new judicial federalism,” the high courts of California, New York, New Jersey, Oregon, Washington, and Wisconsin were particularly active, followed by those of New Mexico, Indiana, Georgia, Ohio, Michigan, Connecticut, Minnesota, Utah, Pennsylvania, and many other *815 states.[9] The cases characterize the examination of independent state constitutional grounds by state courts not as some kind of aberration, but as a solemn duty. See, e.g., Burling v. Chandler, 148 N.H. 143, 804 A.2d 471, 476 (2002) (per curiam) (recognizing that oath taken to honor state constitution makes it the justices’ duty to apply the state constitution when it does not conflict with the Federal Constitution); Commonwealth v. Gaffney, 557 Pa. 327, 733 A.2d 616, 621 (1999) (noting even when federal constitutional claim is discharged, supreme court must undertake independent analysis of Pennsylvania Constitution “ ‘each time a provision of that fundamental document is implicated’ ” (citation omitted)); State v. Johnson, 299 Wis.2d 675, 729 N.W.2d 182, 189 n. 7 (2007) (observing court’s duty to examine state constitution independently even if conclusion does not differ from that under Federal Constitution).
As noted by Professor G. Alan Tarr more than a decade ago, the emphasis on the independent nature of state constitutions of the “new judicial federalism” is simply “no longer new.” G. Alan Tarr, The New Judicial Federalism in Perspective, 72 Notre Dame L. Rev. 1097, 1098-99 (1997). Contemporary courts and scholars have recognized and reaffirmed the historically well-established concepts that state constitutional provisions are independent of parallel provisions of the Federal Constitution and that state supreme courts may depart from existing federal precedent in reaching their conclusions regarding state constitutional law. There are textbooks,[10] monographs,[11] hundreds of law review articles,[12] and thousands of report *816 ed cases discussing the independent nature of state constitutional provisions.
The development of independent state constitutional law has not always been a smooth process. A number of state supreme courts have expressed frustration with lawyers who have failed to advance state constitutional arguments. In order to encourage proper advocacy, a number of state supreme courts have published what are referred to in the literature as “teaching opinions,” which review the rationale for independent state constitutional grounds. See, e.g., Friedman v. Comm’r of Pub. Safety, 473 N.W.2d 828 (Minn.1991); Davenport v. Garcia, 834 S.W.2d 4 (Tex.1992); State v. Jewett, 146 Vt. 221, 500 A.2d 233 (1985); Dworkin v. L.F.P., Inc., 839 P.2d 903 (Wyo.1992). See generally Robert F. Williams, The Law of American State Constitutions 144-46 (2009) [hereinafter Williams]. Dworkin is a particularly striking example because the Wyoming Supreme Court attached a bibliography of articles on independent state constitutional development as an appendix to the opinion. 839 P.2d at 920-22.
In light of the availability of state constitutional claims and the complete lack of any strategic reason not to pursue them, a number of state court judicial opinions indicate the failure to bring a state constitutional claim may amount to malpractice. See State v. Lowry, 295 Or. 337, 667 P.2d 996, 1013 (1983) (Jones, J., concurring) (“Any defense lawyer who fails to raise an Oregon Constitution violation and relies solely on parallel provisions under the federal constitution ... should be guilty of legal malpractice.”); Commonwealth v. Kilgore, 719 A.2d 754, 757 (Pa.Super.Ct.1998) (finding counsel ineffective for failure to raise state search and seizure claim); Jewett, 500 A.2d at 235 (noting that legal argument too often “consists of a litany of federal buzz words memorialized like baseball cards”). As bluntly stated by Judge Jeffrey S. Sutton of the United States Court of Appeals for the Sixth Circuit, “no lawyer worth his or her salt can be a good advocate in today’s world without appreciating the possibility — and value — of raising state and federal [constitutional] claims in representing a client.” Jeffrey S. Sutton, Why Teach — and Why Study — State Constitutional Law, 34 Okla. City U. L. Rev. 165, 178 (2009) [hereinafter Sutton]; see also State Constitutions in the Federal System at 70 (“Local practitioners have an obligation to raise the issue that the state court can grant broader protection under its own constitution[.]”). See generally 1 Friesen § 1.08, at 1-57 to 1-66 (suggesting a manner by which to raise and argue independent state constitutional grounds).
*817 Yet, as observed in an introduction to a conference on state constitutional law developments almost thirty years ago, “[o]ld habits die hard.” A.E. Dick Howard, Introduction: A Frequent Recurrence to Fundamental Principles, in Developments in State Constitutional Law xi, xxii (Bradley D. McGraw ed., 1985). According to the 1989 report of the Advisory Commission on Intergovernmental Relations, “Even among lawyers, state constitutional law is relatively unknown and little practiced.” State Constitutions in the Federal System at 2.
In order to help remedy the situation, the Conference of Chief Justices in 2010 passed a resolution urging all law schools to offer a course in state constitutional law. Robert F. Williams, Why State Constitutions Matter, 45 New Eng. L. Rev. 901, 909, 912 (2011) (reproducing text of resolution as an appendix). The resolution stated, among other things, that state constitutional “declarations of rights ... are often greater than federally guaranteed rights and liberties” and that “being a competent and effective lawyer requires an understanding of both the Federal Constitution and state constitutional law.” Id. at 912.
An important feature of independent state constitutional law is that it is not “liberal” or “conservative.”[13] Rather, state constitutional law involves recognition of the independent nature of state constitutions and the obligation of state courts in our federal system. See Barry Latzer, Whose Federalism? Or, Why “Conservative” States Should Develop Their State Constitutional Law, 61 Alb. L. Rev. 1399, 1403-10 (1998). See generally Stanely Mosk, State Constitutionalism: Both Liberal and Conservative, 63 Texas L. Rev. 1081 (1985). While labels are illusive — is our evolving search and seizure jurisprudence, liberal, conservative, or libertarian? — independent state constitutional analysis can yield outcomes that might appeal to persons who regard themselves as politically “conservative.” Certainly the result in Torn favored the state over criminal defendants. And, in the wake of the United States Supreme Court decision in Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), the Ohio Supreme Court, on independent state grounds, provided greater protection to property rights under the Ohio Constitution than were provided by the United States Supreme Court. Norwood v. Horney, 110 Ohio St.3d 353, 853 N.E.2d 1115, 1123, 1128-42 (2006). Additionally, the New Hampshire Supreme Court found under its state equal protection clause that the right to enjoy property is subject to intermediate scrutiny. Cmty. Res. for Justice, Inc. v. City of Manchester, 154 N.H. 748, 917 A.2d 707, 717-21 (2007); see *818 also Timothy Sandefur, Don’t Mess with Property Rights in Texas: How the State Constitution Protects Property Owners in the Wake of Kelo, 41 Real Prop. Prob. & Tr. J. 227, 228-30, 252 (2007) (arguing the Texas Constitution’s public use clause provides more protection to property owners than the United States Constitution).
The rebirth of state constitutional law has advanced constitutional dialogue both horizontally and vertically within the federal system. Consistent with Justice Louis Brandeis’s famous declaration that a state in the federalist system amounts to a “laboratory” of democracy, see New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386-87, 76 L.Ed. 747, 771 (1932) (Brandéis, J., dissenting), the vibrancy of state constitutional law has been a salutary development in promoting horizontal federalism, or dialogue among the states. See Robert F. Williams, State Constitutional Methodology in Search and Seizure Cases, 77 Miss. L.J. 225, 253 (2007) [hereinafter State Constitutional Methodology]', see also Ronald K.L. Collins, Reliance on State Constitutions: Some Random Thoughts, 54 Miss. L.J. 371, 409 (1984) [hereinafter Collins]. Just as a state court exploring products liability in the 1950s would certainly consult Justice Roger Traynor’s concurring opinion in Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436, 440-44 (1944) (Traynor, J., concurring), state supreme courts consult the cases of other states in developing their own state constitutional law. Collins, 54 Miss. L.J. at 408. For example, in Torn, we canvassed academic authorities, dissenting federal authorities, and the law of other state supreme courts. See 195 Iowa at 103-09, 191 N.W. at 534-36. Similarly, in Cline, Ochoa, and Pals, we canvassed cases from other states to determine the best result on search and seizure questions under the Iowa Constitution. Pals, 805 N.W.2d at 775-77, 779; Ochoa, 792 N.W.2d at 283-84; Cline, 617 N.W.2d at 289-90. With computer-based legal research, state supreme court justices and their clerks have ready access to recent state constitutional analyses in other states that can serve as a springboard for analysis. The cross-fertilization opportunities in the development of state constitutional law have never been greater. See State Constitutional Methodology, 77 Miss. L.J. at 253 (stating that “state courts are remiss” if they do not use modern research methods to look at decisions of other state courts).
The growth of independent state constitutional law also promotes vertical federalism, or a constitutional dialogue between state and federal courts regarding the proper interpretation of an open-textured constitutional provision. See James A. Gardner, Interpreting State Constitutions: A Jurisprudence of Function in a Federal System 100 (2005) [hereinafter Gardner].[14] In this regard, commentators have cited our century old case of State v. Sheridan, 121 Iowa 164, 96 N.W. 730 (1903), as a precursor to the adoption of the exclusionary rule by the United States Supreme Court in Weeks. See, e.g., Joseph Blocker, *819 Reverse Incorporation of State Constitutional Law, 84 S. Cal. L. Rev. 823, 372 n. 255 (2011); Collins, 54 Miss. L.J. at 415; see also G. Alan Tarr, Understanding State Constitutions 163 n. 119 (1998) [hereinafter Tarr ]. When the United States Supreme Court incorporated the exclusionary rule against the states in Mapp, it noted a majority of states had already adopted it. 367 U.S. at 651, 81 S.Ct. at 1689, 6 L.Ed.2d at 1087-88.
State supreme court decisions have also impacted the permissible scope of warrant-less searches incident to lawful arrests in the automobile context. In New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981), the United States Supreme Court held law enforcement officers could conduct thorough vehicle searches, incident to arrest, including inside closed containers. In the aftermath, a number of state supreme courts rejected Belton ⅛ reasoning when interpreting parallel state constitutional provisions. See, e.g., State v. Hernandez, 410 So.2d 1381, 1384-85 & n. 2 (La.1982); State v. Harnisch, 114 Nev. 225, 954 P.2d 1180, 1182-83 (1998); State v. Pierce, 136 N.J. 184, 642 A.2d 947, 959-60 (1994); State v. Rowell, 144 N.M. 371, 188 P.3d 95, 101 (2008); People v. Blasich 73 N.Y.2d 673, 543 N.Y.S.2d 40, 541 N.E.2d 40, 44-45 (1989); Commonwealth v. White, 543 Pa. 45, 669 A.2d 896, 902 (1992); State v. Bauder, 181 Vt. 392, 924 A.2d 38, 46-47 (2007); State v. Stroud, 106 Wash.2d 144, 720 P.2d 436, 440-41 (1986) (plurality opinion), overruled on other grounds by State v. Valdez, 167 Wash.2d 761, 224 P.3d 751, 758-60 (2009); Vasquez v. State, 990 P.2d 476, 488-89 (Wyo.1999); see also Commonwealth v. Toole, 389 Mass. 159, 448 N.E.2d 1264, 1266-68 (1983) (rejecting Belton based on state statute). These courts demonstrated respect for the United States Supreme Court, but nonetheless strongly disagreed with its reasoning. Ultimately, the United States Supreme Court abandoned much of Belton, citing among other things the developments in the states. See Arizona v. Gant, 556 U.S. 332, 338, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485, 493 (2009). See generally State v. Vance, 790 N.W.2d 775, 786-90 (Iowa 2010).
State high court rulings interpreting state constitutions have paved the way for the United States Supreme Court in a number of other areas. See generally Joseph Blocher, Reverse Incorporation of State Constitutional Law, 84 S. Cal. L. Rev. 323, 371-85 (2011) (discussing the influence of state constitutional law in criminal procedure, due process, and Eighth Amendment cases). For instance, the California Supreme Court ruling regarding miscegenation in Perez v. Lippold, 32 Cal.2d 711, 198 P.2d 17 (1948), was a precursor to the United States Supreme Court decision in Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). William B. Rubenstein, The Myth of Superiority, 16 Const. Comment. 599, 622 n. 91 (1999). Similarly, the decision of the Georgia Supreme Court under the Georgia Constitution to prohibit the criminalization of same-sex sodomy in Powell v. State, 270 Ga. 327, 510 S.E.2d 18 (1998), contributed to the overruling of Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Lawrence v. Texas, 539 U.S. 558, 576, 123 S.Ct. 2472, 2483, 156 L.Ed.2d 508, 524 (2003) (specifically citing Powell as an example of a state court’s decision to depart from Bowers under its state constitution).[15] See generally Gardner at 100-03 (providing overview of the *820 Georgia decision in Powell and subsequent reaction). Further, the California Supreme Court in People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748, 761-62 (1978), held the use of a preemptory challenge to remove a juror based on the juror’s membership in a particular racial, religious, or ethnic group violates the California Constitution. This decision predated the same conclusion by the United States Supreme Court under the United States Constitution in Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 82-83 (1986).
The dialogic nature of state constitutional law — both vertical and horizontal — is highly desirable and should cause celebration, not handwringing. See Jason Maz-zone, The Bill of Rights in the Early State Courts, 92 Minn. L. Rev. 1, 6 (2007) [hereinafter Mazzone] (stating that “[ajllowing state courts to adopt more expansive readings of constitutional rights generates information about how rights might be structured” and that “[sjuch experimentation produces systemic benefits”); Lawrence Gene Sager, Fair Measure: The Legal Status of Underenforced Constitutional Norms, 91 Harv. L. Rev. 1212, 1251-52 (1978) (noting many reforms of the Warren Court were already well-established matters of state law in a number of states). The interactions fostered by the rebirth of independent state constitutional law demonstrate that the system of dual sovereignty is now functioning more closely to the federalist ideal.
B. Independent Iowa State Constitutional Law After Incorporation. After incorporation, the first requirement, of course, was to ensure that Iowa law provided the floor of protection offered by the United States Constitution in criminal procedure, including the Fourth Amendment. Immediately following incorporation, we primarily adjusted to the incorporation revolution under the Warren Court and our caselaw under the Iowa Constitution tended to run parallel to the evolving federal caselaw. See Ochoa, 792 N.W.2d at 265-66 (discussing older Iowa cases).
As the United States Supreme Court began to scale back on substantive holdings under the Bill of Rights of the United States Constitution, we on a number of occasions took a different path under our state constitution. We have applied independent Iowa state constitutional law in the areas of equal protection, see, e.g., Varnum v. Brien, 763 N.W.2d 862, 896 (Iowa 2009); Racing Ass’n of Cent Iowa v. Fitzgerald (RACI), 675 N.W.2d 1, 7 (Iowa 2004); Bierkamp v. Rogers, 293 N.W.2d 577, 579 (Iowa 1980), cruel and unusual punishment, see State v. Bruegger, 773 N.W.2d 862, 883 (Iowa 2009), due process, see State v. Cox, 781 N.W.2d 757, 761 (2010); Callender v. Skiles, 591 N.W.2d 182, 187, 189 (Iowa 1999), and search and seizure, see Pals, 805 N.W.2d at 782; Ochoa, 792 N.W.2d at 267; State v. Tague, 676 N.W.2d 197, 204, 206 (Iowa 2004); Cline, 617 N.W.2d at 284-85; State v. Cullison, 173 N.W.2d 533, 538-39 (Iowa 1970).
Of course, we are free to follow persuasive United States Supreme Court precedent in the interpretation of state constitutional provisions. For example, in State v. Breuer, 808 N.W.2d 195, 201-03 (Iowa 2012), we followed persuasive federal precedent and declined to require that a search warrant be physically present in a hospital room before police may obtain a blood draw from a person suspected of driving while intoxicated. Even where we have declined to take a different path under the Iowa Constitution, however, we have respectively emphasized that we jealously guard our right to do so. See, e.g., State v. Becker, 818 N.W.2d 135, 149 (Iowa 2012); State v. Kurth, 813 N.W.2d 270, 283 (Iowa 2012) (Appel, J., concurring specially); *821 Hensler v. City of Davenport, 790 N.W.2d 569, 579 n. 1 (Iowa 2010); Zaber v. City of Dubuque, 789 N.W.2d 684, 654 (Iowa 2010); Dykstra v. Iowa Dist. Ct., 788 N.W.2d 473, 480 (Iowa 2010); State v. Wilkes, 756 N.W.2d 838, 842 n. 1 (Iowa 2008); In re Det. of Hennings, 744 N.W.2d 333, 337 (Iowa 2008); State v. Hoskins, 711 N.W.2d 720, 725 (Iowa 2006); State v. Beckett, 532 N.W.2d 751, 755 (1995); State v. Groff, 323 N.W.2d 204, 207-08 (Iowa 1982); State v. Olsen, 293 N.W.2d 216, 219-20 (Iowa 1980).
One of the questions we have faced in developing our independent state constitutional law was whether an opinion of the United States Supreme Court under the provision of the United States Constitution was entitled to a “presumption of correctness” in the interpretation of a parallel or similar provision of the Iowa Constitution. In Ochoa, we declared, among other things, that there is no presumption that the federal law is the correct approach. 792 N.W.2d at 267. We came to the same conclusion as Oregon Supreme Court Justice Hans Linde, who three decades ago described a state court’s blind adoption of federal constitutional doctrine when interpreting its state constitution as a “non sequitur that the United States Supreme Court’s decisions under such a text, not only deserve respect but presumptively fix its correct meaning also in state constitutions.” State v. Kennedy, 295 Or. 260, 666 P.2d 1316, 1322 (1983). Our view also aligned with leading commentators. As noted by Professor Robert F. Williams, the premise that United States Supreme Court interpretations of the Bill of Rights of the United States Constitution are presumptively correct for interpreting analogous provisions of state constitutions is “simply wrong.” Williams at 135; see also Dorothy T. Beasley, The Georgia Bill Of Rights: Dead or Alive, 34 Emory L.J. 343, 414 (1985) (“The virtual piggybacking of the state clause onto the federal clause renders the former a parasite instead of an independent source of authority.”). According to Professor Williams, a state court interpreting its state constitution should give less weight to United States Supreme Court decisions than the decisions of other states interpreting similar provisions because “federalism and other institutional concerns, either explicitly or implicitly, pervade Supreme Court decisions declining to recognize rights against states.” Williams at 137. Williams accordingly discounts these decisions because of the possibility of underenforcement of the Bill of Rights of the United States Constitution. Id. Otherwise, as indicated by Justice David Souter, then of the New Hampshire Supreme Court, state courts would be reduced to “a mere row of shadows.” State v. Bradberry, 129 N.H. 68, 522 A.2d 1380, 1389 (1986) (Souter, J., concurring specially).
To date, we have yet to adopt the primacy approach to state constitutional law. Under the primacy approach, a state supreme court addresses state constitutional issues before moving to issues under the Federal Constitution. See, e.g., State v. Cadman, 476 A.2d 1148, 1150 (Me.1984); State v. Weeks, 137 N.H. 687, 635 A.2d 439, 445-46 (1993), abrogated on other grounds by State v. Knickerbocker, 152 N.H. 467, 880 A.2d 419, 423 (2005); Sterling v. Cupp, 290 Or. 611, 625 P.2d 123, 126 (1981).[16] The primacy approach has the desirable feature of avoiding unnecessary federal constitutional adjudications and in obtaining finality. Jerome B. Falk, Jr., Fore *822 word: The State Constitution: A More than “Adequate” Nonfederal Ground, 61 Cal. L. Rev. 273, 286 (1973); see also State Constitutions in the Federal System at 70 (characterizing primacy approach as “useful” because it avoids unnecessary federal adjudications, allows state courts to decide questions of state law, takes pressure off the United States Supreme Court, promotes consideration of the character of a state, and promotes state experimentation). Though only adopted by a few courts, and then perhaps honored in the breach more than followed,[17] the primacy approach has had the support of Justice Linde[18] as well as United States Supreme Court Justice John Paul Stevens.[19] As noted by Justice Stevens:
The emerging preference for state constitutional bases of decision in lieu of federal ones is, in my view, the analytic approach best suited to facilitating the independent role of state constitutions and state courts in our federal system.
Delaware v. Van Arsdall, 475 U.S. 673, 705, 106 S.Ct. 1431, 1448-49, 89 L.Ed.2d 674, 699 (1986) (Stevens, J., dissenting).
Instead, we have adopted a more measured approach under which we are free to consider either state or federal constitutional provisions first. For instance, in Cox and Tague, we elected to address the state constitutional issues involving due process and search and seizure first, leaving the federal constitutional issues undecided. Cox, 781 N.W.2d at 772; Tague, 676 N.W.2d at 206. On the other hand, in Mitchell County v. Zimmerman, 810 N.W.2d 1, 18 (Iowa 2012), and Kurth, 813 N.W.2d at 281, we addressed federal constitutional issues in cases involving religious liberty and search and seizure, respectively, and reserved state constitutional questions. By exercising our discretion regarding which claim to address first, we can choose the clearest path to the resolution of a case.
Our approach to independent state constitutional law in the search and seizure area has been cautious. We have required that state constitutional grounds must be properly before the court, sometimes strictly enforcing our preservation rules. For example, in State v. Lowe, 812 N.W.2d 554, 577 (Iowa 2012), the majority of this court declined to consider whether we should adopt a Johnson v. Zerbst-type knowing and voluntary requirement for a consent search under article I, section 8 of the Iowa Constitution because the parties did not specifically raise the argument. When a party argues from federal caselaw but does not assert a different substantive standard under the Iowa Constitution, we ordinarily decline to develop a new standard, but reserve the power to apply the federal standard in a manner different from federal caselaw. See, e.g., Bruegger, 773 N.W.2d at 883; RACI, 675 N.W.2d at 6-7. The distinction between a standard and its application is especially important where the legal principles have high degrees of generality, such as “totality of circumstances” tests, tests based upon *823 “gross proportionality,” and tests based upon “reasonableness.” See Williams at 169-71; Jeffrey S. Sutton, What Does— and Does Not — Ail State Constitutional Law, 59 U. Kan. L. Rev. 687, 707 (2011) [hereinafter Sutton].
In part because of our relatively stringent preservation rules, the Iowa caselaw in the area of search and seizure involving independent state grounds has been modest. In Cline, we joined a minority of state jurisdictions rejecting the “good faith” exception to the exclusionary rule announced by the United States Supreme Court in Leon. Cline, 617 N.W.2d at 293. In Tague, we held that an isolated incident of crossing the centerline did not provide probable cause or reasonable suspicion for a traffic stop under article I, section 8 of the Iowa Constitution. 676 N.W.2d at 206. We have also rejected the sweeping notion of Samson v. California, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), that general searches of parolees may be conducted without any showing of particularity. See Ochoa, 792 N.W.2d at 291. We have insisted on a more realistic analysis of what amounts to “voluntary consent” in the context of automobile searches. Pals, 805 N.W.2d at 782-83.
Each of our independent search and seizure cases has been narrowly crafted, reflecting a cautious approach to the development of our state constitutional law. Our independent search and seizure cases emphasize the traditional requirement of particularity to cabin government discretion in the search and seizure context and engage in realistic assessment of the vol-untariness of consent. These two themes merge to remind law enforcement of the wisdom in the jurisprudence of United States Supreme Court Justice Potter Stewart: when in doubt, get a warrant. See Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298-99 (1978) (reminding us that “it is a cardinal principal that ‘searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions’ ” (quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (footnotes omitted))). In short, we have sought to develop an Iowa search and seizure jurisprudence that prevents arbitrary exercise of government power in a realistic way in today’s world.
C. Challenges to Independent State Constitutional Law by Constitutional Nationalists.
1. Introduction. During the past forty years, “constitutional nationalists”[20] have challenged the development of independent state constitutional law. Writing in 1998, a leading commentator declared that the concerns of constitutional nationalists had “largely been put to rest.” Tarr at 169. While the paths pursued below have been well traveled by courts and commentators, some of the objections of the constitutional nationalists to a robust federalist system with vibrant independent state constitutional law should be put to rest.
2. Parallel language. Constitutional nationalists sometimes suggest that because the Fourth Amendment text and the text of the search and seizure provisions of state constitutions, like article I, section 8 of the Iowa Constitution, are nearly identical, state courts must follow the interpretive decisions of the United States Supreme Court. We have previously ad *824 dressed and rejected this argument. See, e.g., Ochoa, 792 N.W.2d at 267; Tonn, 195 Iowa at 104-07, 191 N.W. at 535-36.
The Tonn-Ochoa notion that parallel language in a state constitution is not tied to United States Supreme Court interpretations was recently powerfully endorsed by Judge Sutton:
There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized guarantee, such as prohibition on “unreasonable” searches, would have just one meaning for a range of differently situated sovereigns.
Sutton, 59 U. Kan. L. Rev. at 707. Many state courts reflect Judge Sutton’s approach. See, e.g., State v. Gerschoffer, 763 N.E.2d 960, 965 (Ind.2002) (noting that Indiana Constitution “has unique vitality, even where its words parallel federal language”); People v. Barber, 289 N.Y. 378, 46 N.E.2d 329, 331 (1943) (noting that New York Court of Appeals is “bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States”); State v. Arrington, 311 N.C. 633, 319 S.E.2d 254, 260 (1984) (“In construing provisions of the Constitution of North Carolina, this Court is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States.”); Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887, 895-96 (1991) (“Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution, we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical.”); O’Boyle v. State, 117 P.3d 401, 408 (Wyo.2005) (noting search and seizure provision of Wyoming Constitution, which parallels the Fourth Amendment, provides “a separate and independent source of protection of the rights of Wyoming citizens”).
The notion that state supreme courts should simply mirror the interpretations of the United States Supreme Court in interpreting parallel provisions of state constitutions is a flawed method of judging. This technique amounts to what Professor Adrian Vermeule refers to as “a precom-mitment device” that prevents a state supreme court from considering each case based on an independent examination of facts and law. See Adrian Vermeule, The Judicial Power in the State (and Federal) Courts, 2000 Sup. Ct. Rev. 357, 366 (2000); see also Williams at 226.
As a result, lockstepping state law to federal precedents is not a humble or minimalist approach, but is an aggressive and maximalist approach to the law. Williams at 224-29.[21] Through the imposition of lockstep, constitutional nationalists seek not only to provide the rule of decision in a particular case, but in literally hundreds of cases in one master stroke. Lockstepping is the antithesis of the ordinary judicial method, which grinds more slowly and finely, decides what needs to be decided and no more, reserving future legal questions for the next case. As noted by two scholars, “Judicial federalism offers the opportunity to weigh alternatives over time, to keep an open mind, to reflect, and *825 to develop visions of the good, without rushing headlong into the straitjacket of national policy.” Michael E. Solimine & James L. Walker, Respecting State Courts: The Inevitability of Judicial Federalism 138 (1999) [hereinafter Solimine & Walker].
3. Uniformity. The development of independent state constitutional law is sometimes challenged on the pragmatic ground that it tends to defeat the development of uniform standards that apply under both the Federal and State Constitutions. The decision against uniformity, however, was made by the framers of the United States Constitution and the Iowa Constitution in favor of dual sovereignty. We have no authority to alter it. See, e.g., State v. Smith, 117 Wash.2d 263, 814 P.2d 652, 661 (1991) (Utter, J., concurring) (noting that lockstepping would require rewrite of state constitution). We cannot add a proviso to the Tenth Amendment that declares, “State courts should defer to federal court interpretations of Bill of Rights provisions,” nor can we add a provision to article I, section 8 of the Iowa Constitution declaring, in the interest of uniformity, that we will decline to exercise our independent authority to interpret the state constitution.[22] Demands for a uniform approach undermine the “double security” that Madison proclaimed the states provided in the federal framework. See Duncan, 391 U.S. at 173, 88 S.Ct. at 1461, 20 L.Ed.2d at 509-10 (Harlan, J., dissenting) (noting federalism protects “the security of liberty in America ... [through] the dispersion of governmental power across a federal system”); see also State v. von Bulow, 475 A.2d 995, 1019 (R.I.1984) (finding search without a warrant unlawful and commenting that state and federal constitutions provide a “double barrelled source of protection” (citation and internal quotation marks omitted)); 1 Friesen § 1.03[4][a], at 1-14 to 1-15 (noting that independent state • constitutional analyses lead to “a net gain in liberty,” that uniformity deprives states of sovereignty and local control, and that uniformity is illusory because it is impossible for the United States Supreme Court to review every case applying federal constitutional law); Stanley G. Feldman & David L. Abney, The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution, 20 Ariz. St. L.J. 115, 117 (1988) (“If we choose to follow federal precedent to bolster nationwide conformity, we destroy the ‘double security’ designed to protect our citizens.”); Mazzone, 92 Minn. L.Rev. at 5-6, 74 (arguing consolidation of constitutional law is “inconsistent with federalism” because “federalism works best when different political unitys are able to try different approaches and solve problems in different ways”).
Indeed, the United States Supreme Court has held that the United States Constitution prohibits the federal government from commandeering a state legislature or a state executive and making them foot soldiers in the creation and enforcement of federal law. See, e.g., Printz v. United States, 521 U.S. 898, 935, 117 S.Ct. 2365, 2384, 138 L.Ed.2d 914, 944 (1997) (invalidating provisions of Brady Handgun Violence Prevention Act because United States Constitution prohibits requiring state executive officials from enforcing federal law); New York v. United States, 505 U.S. 144, 180-83, 112 S.Ct. 2408, 2430-32, 120 L.Ed.2d 120, 153-55 (1992) (invalidating environmental law provision that commandeered state legislature); see also *826 Mazzone, 92 Minn. L. Rev. at 75-76 (arguing consolidation of constitutional law fails to respect the importance placed upon state courts by the United States Constitution). Similarly, state courts cannot become stone breakers pursuant to some kind of self-imposed corvée duty that requires federal precedent to be used as hammers to break state constitutional rock.
Further, even on a pragmatic level, the case for uniformity is unpersuasive. First, it would defeat the positive features of the federalist system which was so important to the founding generation. As one commentator has noted:
Rules that govern relations between police officers and local citizens, or between cities and school boards and their employees, are not necessarily better decided, or more efficiently decided, by nine judicial appointees with a national responsibility and allegiance. Insisting on a national, uniform legal culture ignores the reality and richness of state differences.
1 Friesen § 1.03[4][a], at 1-14 to 1-15 (footnote omitted).
The position of state supreme court justices closer to daily law enforcement activities has not been lost on the United States Supreme Court. For instance, Justice Ginsberg has noted that state courts have a “unique vantage point” in automobile stop cases. See Ohio v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417, 422, 136 L.Ed.2d 347, 355 (1996) (Ginsburg, J., concurring).
Moreover, it is clear that uniformity will not be achieved by adopting United States Supreme Court precedents under the state constitution. See 1 Friesen § 1.03[4][a], at 1-15. The Supreme Court is capable of handling only a few search and seizure cases each year. As a result, there are many issues dividing the federal circuits that remain undecided. A recent survey of search and seizure precedents in the federal circuits reveal over three dozen current splits that have not been mediated by the United States Supreme Court. See Wayne A. Logan, Constitutional Cacophony: Federal Circuit Splits and the Fourth Amendment, 65 Vand. L. Rev. 1137, 1147-60 (2012); see also John Harrison, Federal Appellate Jurisdiction Over Questions of State Law in State Courts, 7 Green Bag 2d 353, 356 (2004) (noting that “[fjederal law is notoriously non-uniform among the different circuits”); Mazzone, 92 Minn. L.Rev. at 74-75 (warning not to overvalue uniformity because “our legal system tolerates a good deal of inconsistency and nonuniform outcomes”); Michael E. Solimine, The Future of Parity, 46 Wm. & Mary L.Rev. 1457, 1483 (2004) (explaining that “[e]ven narrowly focused federal rights often have nonuniform application”).
In addition, past cases demonstrate that it is difficult to determine the methodology that the United States Supreme Court will apply to determine a search and seizure issue. In recent years, the Supreme Court has applied at least five different analytical models, based upon the warrant requirement, individualized suspicion, case-by-case analysis, a balancing test, and an approach relying on the common law plus balancing to resolve search and seizure issues. See Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 470-531 (2008) [hereinafter Clancy], In any given case, it is impossible to predict which model will apply.
As a result, even if uniformity were the goal, a policy of blind adoptionism may cause more harm than it is worth. As noted recently by the Tennessee Supreme Court, “[state] constitutional standards are not destined to walk in lock step with the uncertain and fluctuating federal standards and do not relegate [state] citizens to the lowest levels of constitutional pro *827 tection, those guaranteed by the national constitution.” Planned Parenthood of Middle Tenn. v. Sundquist, 38 S.W.3d 1, 14-15 (Tenn.2000) (citation and internal quotation marks omitted).
Another pragmatic ground offered in support of uniformity is that law enforcement will be too confused by independent state constitutional law. This argument is flawed. As has been repeatedly pointed out, there are not two standards for state law enforcement officials when a state supreme court develops its independent state law in criminal procedure. Law enforcement officials need not learn two different standards; they need only learn one, namely, whatever standard is most restrictive. See 1 Friesen § 1.03[4][b], at 1-15 to 1-16; Tarr at 181 n. 32. Given the professionalism and training of Iowa law enforcement, we should not sell their abilities so short. Iowa law enforcement is not inferi- or in ability to its counterparts in New York, New Jersey, Wisconsin, Oregon, Georgia, Minnesota, Indiana, and the many other states that have embraced robust independent state constitutional law.
Finally, uniformity converts a state supreme court into a legal chameleon that changes color with the latest changes in the jurisprudence of the United States Supreme Court. Do we retire the writings of Justices Brandéis, Holmes, Cardozo, Stone, and Jackson because their views are no longer cited by current majorities of the United States Supreme Court? And what about the Iowa legal tradition and culture as reflected in In re Ralph and its progeny? As former Chief Justice of Indiana Randall Shepard noted:
[W]hat respectable alternative is there to independent state constitutional jurisprudence? Is it a nation where civil liberties at all levels of activity depend solely on whether the left, the center, or the right of the U.S. Supreme Court is ascendant at the moment? Is it a country where state courts hearing ninety percent of the litigation resolve the most important cases without regard to their own history or precedent? Surely not.
Randall T. Shepard, The Maturing Nature of State Constitution Jurisprudence, 30 Val. U. L. Rev. 421, 456 (1996). Under the uniformity theory, the Iowa Supreme Court would morph into a Twelfth United States Circuit Court of Appeals.
4. Deference to United States Supreme Court Justices. The deference notion is contrary to a number of threads of constitutional development. The abandonment of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), for the rule in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), tended to remove federal judges from interpretation of state law. Further, as indicated in Stone v. Powell, 428 U.S. 465, 493 n. 35, 96 S.Ct. 3037, 3052 n. 35, 49 L.Ed.2d 1067, 1087 n. 35 (1976), and its progeny, the United States Supreme Court has confidence in the ability of the state courts to handle federal constitutional claims. The discovery that state courts are now disabled from independently considering state constitutional claims because of their alleged lack of quality cuts against these important trends in federal law.
In any event, the notion that members of the United States Supreme Court have some kind of superior wisdom that we must show deference to when interpreting provisions of the Iowa Constitution is doubtful at best. History shows otherwise. Most of us would prefer the decisions of Iowa judges in In 're Ralph to the work of the United States Supreme Court in Dred Scott and the generous Iowa approaches in Clark and Coger to the narrow approach in Plessy. Cases like Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), and Dennis v. *828 United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), do not inspire our confidence. See Louis Henkin, Revolutions and Constitutions, 49 La. L. Rev. 1023, 1042-43 & n.28 (1989). Indeed, it has been suggested that through most of our history, federal courts have come up short in the protection of basic American rights. Solimine & Walker at 28.
Further, extraordinary state court judges with outstanding reputations have helped to develop what is now a substantial body of independent state constitutional law. Among others, distinguished state judges such as Shirley Abrahamson of Wisconsin, Christine Durham of Utah, Thomas Hayes of Vermont, Judith Kaye of New York, Hans Linde of Oregon, Stanley Mosk of California, Ellen Peters of Connecticut, Stewart Pollock of New Jersey, Randall Shepard of Indiana, Marsha Ter-nus of Iowa, and Robert Utter of Washington have enriched the legal culture in their states and across the nation.[23] There is no basis to discount the work of these outstanding state supreme court justices. Is there any reason to believe that Justices Holmes, Cardozo, O’Connor, and Souter were less intelligent or less capable when they served on state supreme courts? As noted by two observers, “Considering the judicial systems as a whole, we believe it is demeaning and inaccurate to assert a lack of talent in the state and local judicial arena.” Solimine & Walker at 132.
In fact, there is reason to believe that in some respects, state supreme court justices may be better positioned than United States Supreme Court Justices to decide questions of state constitutional law. As noted above, state judges are not affected by federalism concerns and will not face pressures to underenforce constitutional norms. Further, as Justice Abrahamson pointed out, criminal law is an area of traditional expertise for state court judges. Abrahamson, 63 Tex. L. Rev. at 1148-49. Justice Ginsberg made a similar point in Robinette, noting that state courts have a “unique vantage point” in assessing the constitutional dimensions of traffic stops. 519 U.S. at 40, 117 S.Ct. at 422, 136 L.Ed.2d at 355.
In any event, what is required in constitutional adjudication is not brilliance, but judgment. As Justice Holmes said long ago when serving on the Supreme Judicial *829 Court of Massachusetts, “[I]t is vain to suppose that solutions can be attained merely by logic and general propositions of law which nobody disputes.” Vegelahn v. Guntner, 167 Mass. 92, 44 N.E. 1077, 1080, (1896) (Holmes, J., dissenting). Phrased somewhat differently, “The life of the law has not been logic, it has been experience.” Oliver Wendell Holmes, The Common Law 1 (1881).
Notwithstanding the above, no one could claim that state court judges in Iowa or in other states are perfect. Justice Linde observed that “most state courts had a poor record of taking seriously the individual rights and fair procedures promised in their states’ bills of rights.” Hans A. Linde, E Pluribus — Constitutional Theory and State Courts, 18 Ga. L. Rev. 165, 174 (1984). To the extent there are shortcomings, however, the solution, as Professor Paul Bator pointed out over thirty years ago, is to “create conditions to assure optimal performance by the state courts.” Paul M. Bator, The State Courts and Federal Constitutional Litigation, 22 Wm. & Mary L. Rev. 605, 624 (1981).
5. Efficiency. Although it is rarely pub-lically advanced as a reason for not engaging in independent state constitutional analysis, simply adopting the results of federal cases might be defended as more efficient for courts and judges. Developing a meaningful independent state constitutional analysis is hard work. Ken Gorm-ley, Significant Developments in State Constitutional Law, 1988, 2 Emerging Issues St. Const. L. 1, 2 (1989). It would be easier to simply match our constitutional cases against federal precedents, briefly state our conclusion, and call it a day.
The problem with this approach, however, is that it ignores our obligation to construe our independent state constitution. Efficiency was not a goal of the framers of either the United States or Iowa Constitutions, and it should not be ours, either. If efficiency were the constitutional goal, there would be no bicameral legislature, no separation of powers, federalism would be replaced by a unified national state, and there would, of course, be no state courts. Instead, we must do the job assigned to us in our constitutional system as justices of the Supreme Court of Iowa, challenging as it may be,[24] and decide each and every independent constitutional claim we confront based on Iowa law and the peculiar facts.
6. Summary. State supreme court justices have a constitutional responsibility to do the very best job we can, in each and every case, and to decide state constitutional issues based on law, facts, and the best constitutional wisdom we can collectively muster. Arguments marshaled against independent state constitutional grounds such as claims that parallel language demands uniform outcomes ignores the open-textured qualities of most consti *830 tutional provisions. Claims that cases under State and Federal Constitutions should come to uniform results runs directly counter to the Tenth Amendment and Madisonian concepts of the states providing a “double security” for liberty. In interpreting state constitutional law, state supreme court justices are not pins standing at attention ready to explode when the next divided opinion of the United States Supreme Court rolls down the constitutional alley. Instead, state supreme court justices have a solemn duty to independently determine the meaning and scope of our state constitutional provisions.
D. Challenges to Independent State Constitutional Law in the Context of Search and Seizure. From the beginning, the efforts of the United States Supreme Court to interpret the open-textured provisions of the Fourth Amendment have been fraught with difficulty. The relationship between the two Fourth Amendment clauses, the warrant clause and the reasonableness clause, is not clear. Further, the term “reasonable” is subject, then as now, to many different meanings. See Clancy at 11; Silas J. Wasserstrom, The Fourth Amendment’s Two Clauses, 26 Am. Crim. L. Rev. 1389, 1389-99 (1989).
Interpretation of the Fourth Amendment has been further complicated by technological change. Trespass doctrine developed by the United States Supreme Court in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), was challenged by the advent of the telephone and was ultimately largely supplanted by an expeetation-of-privacy approach. See Katz, 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583; id. at 360, 88 S.Ct. at 516, 19 L.Ed.2d at 587 (Harlan, J., concurring). Now the expectation of privacy approach is being challenged by the Internet and cell phone technology and may be in the process of being replaced by concepts of autonomy. See United States v. Jones, 565 U.S. -, -, 132 S.Ct. 945, 949, 952, 181 L.Ed.2d 911, 918 (2012).
In addition to the difficulties posed by the language and structure of the Fourth Amendment and technology change, there has been a striking lack of stable consensus on the proper application of Fourth Amendment law among the Justices. The Court’s jurisprudence in the search and seizure area has been characterized by distinguished commentators as “not merely complex and contradictory, but often perverse”;[25] as “a mass of contradictions and obscurities”;[26] as involving cases decided within weeks of each other that are “irreconcilable”;[27] as involving an expectation of privacy test that “remains remarkably opaque”;[28] as being “in a state of theoretical chaos”;[29] as maintaining “doctrinal incoherence of Fourth Amendment law” that “disturbs many judges and scholars”; [30] as including “inconsistent and bizarre results”;[31] as being “distressingly *831 unmanageable”;[32] as being “illogical and unwieldy”;[33] and as involving, with each case, “more duct tape on the Amendment’s frame and a step closer to the junkyard.”[34]
The problems in its Fourth Amendment cases have been recognized by the Justices of the United States Supreme Court for several decades. See Gant, 556 U.S. at 349, 129 S.Ct. at 1723, 173 L.Ed.2d at 500 (noting the “checkered history of search-incident-to-arrest exception”); Acevedo, 500 U.S. at 583, 111 S.Ct. at 1993, 114 L.Ed.2d at 636 (Scalia, J., concurring) (referring to Fourth Amendment jurisprudence as “an inconsistent jurisprudence that has been with us for years”); Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 637, 109 S.Ct. 1402, 1424, 103 L.Ed.2d 639, 673 (1989) (Marshall, J., dissenting) (asserting that concept of reasonableness is “virtually devoid of meaning, subject to whatever content shifting judicial majorities, concerned about the problems of the day, choose to give that supple term”); Coolidge v. New Hampshire, 403 U.S. 443, 490-91, 91 S.Ct. 2022, 2050, 29 L.Ed.2d 564, 597 (1971) (Harlan, J., concurring) (calling for overhaul of Fourth Amendment law); Ker, 374 U.S. at 45, 83 S.Ct. at 1646, 10 L.Ed.2d at 745 (Harlan, J., concurring) (noting that Court’s search and seizure decisions are “hardly notable for their predictability”); Chapman v. United States, 365 U.S. 610, 618, 81 S.Ct. 776, 780, 5 L.Ed.2d 828, 834 (1961) (Frankfurter, J., concurring) (“The course of the true law pertaining to searches and seizures ... has not — to put it mildly — run smooth.”).
The incoherence of the Supreme Court’s Fourth Amendment doctrine was recently on full display in Jones, where the Court considered whether the government violated the Fourth Amendment by placing a Global Positioning System tracking device on a suspect’s vehicle. Justice Scalia, relying on his brand of originalist interpretation of the Fourth Amendment, found that the government action amounted to a trespass and was thus an unlawful search. Jones, 565 U.S. at-, 132 S.Ct. at 949, 181 L.Ed.2d at 918. Justice Alito, joined by three other members, found Justice Scalia’s opinion incredulous, concluding that “it is almost impossible to think of late-18th-century situations that are analogous to what took place in this case.” Id. at-, 132 S.Ct. at 958, 181 L.Ed.2d at 928 (Alito, J., concurring). Nonetheless, he found the government’s action unreasonable under the Fourth Amendment. Id. at-, 132 S.Ct. at 964, 181 L.Ed.2d at 934. Justice Sotomayor concurred with Justice Scalia’s majority opinion, but stressed that the Fourth Amendment is not concerned only with trespassory intrusions on property but has broader application. Id. at-, 132 S.Ct. at 955-56, 181 L.Ed.2d at 924-25 (Sotomayor, J., concurring). She noted that with changing technology “it may be necessary to reconsider the premise than an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.” Id. at-, 132 S.Ct. at 957, 181 L.Ed.2d at 926. In light of the inherent challenges of search and seizure law, the historic difficulties faced by the United States Supreme Court, and the fractured opinions in cases like Jones, the notion that we should adopt the United States Supreme Court *832 cases to introduce guidance or uniformity is simply untenable.
Perhaps in part because of the state of federal precedents, the field of search and seizure is one of the most vibrant areas of state constitutional law. The majority of states have some kind of independent state constitutional law in the area. See Barry Latzer, Toward Decentralization of Criminal Procedure: State Constitutional Law and Selective Disincorporation, 87 J. Crim. L. & Criminology 68, 92 (1996) (estimating forty-seven of the fifty states have some departures from federal precedent).
By way of illustration only, a number of state supreme courts, like Iowa, have rejected the “good faith” exception to the exclusionary rule.[35] Similarly, state supreme courts have rejected the approach of the United States Supreme Court with respect to the requirements of affidavits supporting search warrants,[36] the ability of law enforcement to search curbside garbage without a warrant,[37] whether business records in the hands of third parties may be produced without a warrant,[38] whether random road blocks as part of an effort to alleviate drunk driving run afoul of search and seizure principles,[39] whether *833 a seizure requires a show of authority or whether a reasonable belief that one is not free to leave is sufficient,[40] whether a valid consent search requires a knowing and voluntary waiver,[41] the scope of permissible searches pursuant to a traffic stop,[42] the extent and scope of the curtilage,[43] and the validity and scope of reasonable expectations of privacy as an interpretive tool.[44]
A number of courts and scholars have emphasized that search and seizure law is especially amenable to independent state constitutional analysis. This is particularly true as the United States Supreme Court utilizes so called “balancing tests” which involve only contemporary weighing of competing pragmatic considerations about which reasonable persons may differ. See generally T. Alexander Aleini-koff, Constitutional Law in the Age of Balancing, 96 Yale L.J. 943 (1987). Such contemporary balancing involves “legislative or social facts” about which reasonable persons may differ. See Williams at 172-73; see also Neil Coleman McCabe, Legislative Facts as Evidence in State Constitutional Search Analysis, 65 Temp. L. Rev. 1229,1242-51 (1992).
As the above material demonstrates, there áre good reasons to develop an independent body of state constitutional law in the search and seizure arena. We have plenty of judicial company in this undertaking.
E. Summary. The First American Constitutions were state constitutions. Many of the initial state constitutions had search and seizure provisions, which served as a model for Madison as he drafted the Fourth Amendment. Nothing in *834 the adoption of the United States Constitution or the Bill of Rights changed the status of state constitutions as an independent source of law. Indeed, the independent nature of state constitutional provisions was reinforced by adoption of the Tenth Amendment.
For most of our constitutional history, the provisions of the Bill of Rights, of the United States Constitution did not apply against the states. In the middle of the twentieth century, the United States Supreme Court began to incorporate provisions of the Federal Bill of Rights, including the Fourth Amendment, to provide a floor of protection against state transgressions. Incorporation came with two important consequences. One consequence of incorporation was a tendency to dilute the substantive protections in order to avoid a nationwide rule that did not take into account local conditions and experience. Another consequence was that the focus of the legal community shifted toward federal constitutional protections and away from protections in independent state constitutions. As the Supreme Court proceeded to steadily reduce the scope of constitutional protections, however, state courts began to reinvigorate their independent state constitutional analysis.
Independent state constitutional law is now a well-established part of our state’s legal fabric. The independent state constitutional approach utilized by the majority in this case under article I, section 8 is logical, comports with the history of both the United States and Iowa Constitutions, and is solidly supported in our caselaw and the well-reasoned caselaw of other jurisdictions.
III. Resolution of the Constitutional Issues in This Case.
The majority opinion in this case decides, under the particular facts and circumstances, that Baldon’s consent cannot be considered voluntary under article I, section 8 of the Iowa Constitution. We conclude that when an individual is faced with the so-called “choice” of consenting to wide-open suspicionless searches or remaining in prison for an extended period of time, the “choice” is not a truly voluntary one. We thus reject a rigidly formalistic consent doctrine in which the mere fact that a person is presented with a Hobson’s choice is sufficient to make consent voluntary. We base our opinion on the common sense observation that where the state makes the stakes of nonconsent so high that no reasonable person would choose otherwise, there is no realistic choice at all. We continue what we started in Pals, namely, insisting that consent doctrine under article I, section 8 must realistically assess the ability of the individual to say “No.”
For the reasons well expressed in the majority opinion, the outcome in this case is the only reasonable one. It would be a plain Action to maintain that consent to unlimited search authority was voluntary when the consequence of refusal is continued long-term incarceration.
It is possible that such consent would not be found voluntary by the United States Supreme Court under the Fourth Amendment. Cf. United States v. Giannetta, 909 F.2d 571, 576 n. 4 (1st Cir.1990) (stating “a question of coercion would arise as to any contention that ‘agreement’ to a probation search condition constitutes a general consent to search”). The United States Supreme Court, however, has often applied the “totality of circumstances” test of Schneckloth, in a very unrealistic way. In Florida v. Bostick, 501 U.S. 429, 438-40, 111 S.Ct. 2382, 2388-89, 115 L.Ed.2d 389, 400-02 (1991), the Court determined that consent to search by passengers on a bus was voluntary even though armed offi *835 cers prevented passengers from leaving the confined space of the vehicle. Similarly, in INS v. Delgado, 466 U.S. 210, 218, 104 S.Ct. 1758, 1763-64, 80 L.Ed.2d 247, 256 (1984), the Court determined consent to search was voluntary even though armed guards blocked the exits to a workplace. By choosing to base our opinion in this area on the Iowa Constitution, we obtain finality, avoid the necessity of attempting to follow contradictory and doubtful federal authorities, and develop our body of independent law.
IY. Conclusion.
For the reasons expressed above, I join in the majority opinion and concur in the judgment in this case.

. There is substantial literature regarding the formation of state constitutions prior to the adoption of the United States Constitution. See, e.g., Willi Paul Adams, The First American Constitutions: Republican Ideology and the Making of State Constitutions in the Revolutionary Era 55-56 (Rita & Robert Kimber trans., Madison House Books, expanded, ed. 2001); The Constitutionalism of American States (George E. Connor & Christopher W. Hammons eds., 2008); Marc W. Kruman, Between Authority and Liberty: State Constitution Making in Revolutionary America (1997); see also Gordon S. Wood, Foreword: State Constitution-Making in the American Revolution, 24 Rutgers LJ. 911 (1993).

. Under the Supremacy Clause, “[T]he Judges in every State shall be bound [by federal law], any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. As a result, the United States Supreme Court has invalidated state constitutional provisions that violate the United States Constitution. See, e.g., Romer v. Evans, 517 U.S. 620, 635-36, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855, 868 (1996) (striking down Colorado constitutional provision affecting gay rights); U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 783, 827, 115 S.Ct. 1842, 1845, 1866, 131 L.Ed.2d 881, 888, 914-15 (1995) (striking down Arkansas constitutional provision imposing term limits on members of Congress); Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 322-23, 329-30, 18 L.Ed. 356, 362-63, 365 (1867) (striking down loyalty oath imposed by Missouri Constitution).

. Civil liberties provisions in the original draft Constitution included the prohibition against suspension of the writ of habeas corpus except in case of rebellion or invasion, the prohibitions of bills of attainder and ex post facto laws, the provisions for impeachment of all civil officers, the guarantee of jury trials in criminal cases,'the narrow definition of treason, and the ban on religious qualifications for office holding. See U.S. Const, art. I, § 9, els. 2-3; id. art. II, § 4; id. art. Ill, § 2, cl. 3; id. art. Ill, § 3, cl. 1; id. art. VI, cl. 3.

. Of course, it is impossible to determine the degree to which the changes in the United States Supreme Court’s Fourth Amendment jurisprudence were due to the "federalism discount" that Harlan predicted or to changes in personnel on the United States Supreme Court. Explicit statements in Supreme Court opinions during the post-incorporation era show sensitivity to federalism concerns. See Meachum v. Fono, 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451, 462 (1976) (rejecting an approach to impose through the Due Process Clause "a nationwide rule mandating transfer hearings"); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 44, 93 S.Ct 1278, 1302, 36 L.Ed.2d 16, 49 (1973) (noting that "it would be difficult to imagine” a case with greater impact on the federal system if the Court would abrogate systems of financing public education); Johnson v. Louisiana, 406 U.S. 356, 375, 92 S.Ct. 1620, 1640, 32 L.Ed.2d 152, 167 (1972) (Powell, J., concurring) (arguing that incorporating " 'jot-for-jot and case-for-case’ every element of the Sixth Amendment" against the states would derogate "principles of federalism basic to our system”). The tendency of the United States Supreme Court to underenforce constitutional norms due to the national scope of the Court's opinions is recognized in the literature. See, e.g., Developments in the Law— The Interpretation of State Constitutional Rights, 95 Harv. L.Rev. 1324, 1351-60 (1982) (citing institutional differences, the need for national solutions, and sensitivities to federalism as tending to dilute federal constitutional *813 rulings and compelling a cautious and conservative approach to rules while noting state judges are more politically responsive, states have a greater capacity for innovation, and state judiciaries are common law courts that are more used to policy analysis); Lawrence Gene Sager, Fair Measure: The Legal Status of Underenforced Constitutional Norms, 91 Harv. L. Rev. 1212, 1218-20 (1978); George C. Thomas III, When Constitutional Worlds Collide: Resurrecting the Framers' Bill of Rights and Criminal Procedure, 100 Mich. L. Rev. 145, 147-48 (2001) (noting the Court has never had the appetite to apply the provisions of the Federal Bill of Rights to the states as rigorously as it has applied them to the federal government). The tendency to dilute constitutional rules as a result of federalism concerns has been cited in a number of state court cases. See, e.g., State v. Hunt, 91 N.J. 338, 450 A.2d 952, 962 (1982) (Pashman, J., concurring) (observing Supreme Court has been "hesitant to impose on a national level far-reaching constitutional rules binding on each and every state”); Alderwood Assocs. v. Washington Envtl. Council, 96 Wash.2d 230, 635 P.2d 108, 115 (1981) (noting that rules in United States Supreme Court decisions "invariably represent[ ] the lowest common denominator”).

.There is voluminous literature on the independent power of state judiciaries to construe provisions of their state constitutions. The most encyclopedic volume focusing on individual rights is Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses (4th ed. 2006). Three frequently cited surveys of state constitutional law are James A. Gardner, Interpreting State Constitutions: A Jurisprudence of Function in a Federal System (2005), G. Alan Tarr, Understanding State Constitutions (1998), and Robert F. Williams, The Law of American State Constitutions (2009). See also New Frontiers of State Constitutional Law: Dual Enforcement of Norms (James A. Gardner & Jim Rossi eds., 2011); Robert A. Schapiro, Polyphonic Federalism: Toward the Protection of Fundamental Rights (2009); Jeffrey M. Shaman, Equality and Liberty in the Golden Age of State Constitutional Law (2008); Michael E. Solimine & James L. Walker, Respecting State Courts: The Inevitability of Judicial Federalism (1999); G. Alan Tarr & Mary Cornelia Aldis Porter, State Supreme Courts in State and Nation (1988); Toward a Usable Past: Liberty Under State Constitutions (Paul Finkel-man & Stephen E. Gottlieb eds., 1991). Many of the concepts in this opinion have been developed and elaborated upon by Robert F. Williams in The Law of American State Constitutions and Jennifer Friesen in State Constitutional Law: Litigating Individual Rights, Claims, and Defenses.

. See, e.g., Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses (4th ed. 2006) [hereinafter Friesen]; Randy J. Holland, Stephen R. McAllister, Jeffrey M. Shaman & Jeffrey S. Sutton, State Constitutional Law: The Modem Experience (2010); Robert F. Williams, State Constitutional Law: Cases and Materials (4th ed. 2006).

. See Tim J. Watts, State Constitutional Law Development: A Bibliography 3-5 (1991) (listing monographs published prior to 1991 on state constitutional law).

. See id. at 5-36 (listing over 400 articles published prior to 1991 on state constitutional grounds). A tiny sampling of the literature on state constitutional law dealing with the developments in specific states includes Charles W. Johnson & Scott P. Beetham, The Origin of Article I, Section 7 of the Washington State Constitution, 31 Seattle U. L. Rev. 431 (2008); Patty Jones, Search and Seizure — Methodological Contention Results in Conflicting Authority When Deciding Similar State and Federal Constitutional Claims. Commonwealth v. Shaw, *816 564 Pa. 617, 770 A.2d 295 (2001), 33 Rutgers LJ. 1462 (2002); Jack L. Landau, The Search for the Meaning of Oregon's Search and Seizure Clause, 87 Or. L. Rev. 819 (2008); Jack L. Landau, Should State Courts Depart from the Fourth Amendment? Search and Seizure, State Constitutions, and the Oregon Experience, 77 Miss. L.J. 369 (2007); Douglas Holden Wigdor, What's in a Word? Comparative Analysis of Article I, § 12 of the New York State Constitution and the Fourth Amendment to the United States Constitution as Interpreted by the New York Court of Appeals and the United States Supreme Court, 14 Touro L. Rev. 757 (2008); Colin M. Black, Note, "Shooting an Elephant” — Massachusetts Maintains Reasonable Suspicion: Protecting Individual Privacy During Traffic Stops and Battling Racial Profiling, 6 Suffolk J. Trial & App. Advoc. 215 (2001); Dennis J. Buffone, Note, Traffic Stops, Reasonable Suspicion, and the Commonwealth of Pennsylvania: A State Constitutional Analysis, 69 U. Pitt. L. Rev. 331 (2007); Richard C. Miller, Comment, Begging to Defer: Lessons in Judicial Federalism from Colorado Search and Seizure Jurisprudence, 76 U. Colo. L. Rev. 865 (2005); and Kenneth F. Kirwin, Minnesota’s Constitution: An Essential Tool in Search and Seizure Cases, 65 Bench & Bar Minn., Nov. 1, 2008, at 29.

. The New Judicial Federalism is often associated with a seminal law review article written by Justice William Brennan in which Justice Brennan urged state courts to provide more constitutional protections for individuals than was being provided by the United States Supreme Court. See William J. Brennan, Jr., State Constitutions and the Protections of Individual Rights, 90 Harv. L. Rev. 489 (1977). As pointed out by Indiana Chief Justice Randall Shepard, however, scholars and judges were advocating independent state constitutional development well before Justice Brennan’s argument appeared. Randall T. Shepard, The Maturing Nature of State Constitution Jurisprudence, 30 Val. U. L. Rev. 421, 423-24 & n. 9 (1996) (citing Vern Countryman, Why a State Bill of Rights? 45 Wash. L. Rev. 454 (1970), Jerome B. Falk, Jr., Foreword: The State Constitution: A More than “Adequate" Nonfederal Ground, 61 Cal. L. Rev. 273 (1973), Robert Force, State “Bills of Rights": A Case of Neglect and the Need for a Renaissance, 3 Val. U. L. Rev. 125 (1969), Project Report: Toward an Activist Role for State Bilb of Rights, 8 Harv. C.R.-C.L. L. Rev. 271 (1973), and Lawrence M. Newman, Note, Rediscovering the California Declaration of Rights, 28 Hastings L.J. 481 (1974)).

. According to Professor Gardner, state court rejection of United States Supreme Court decisions under state constitutions can ultimately influence opinion on the correctness of the Supreme Court decision, contribute to a state-level nationwide consensus, sometimes considered by the United States Supreme Court, provide a check on national power by prohibiting state and local governments from exercising power granted to them under the United States Constitution, and curb harm to civil liberties brought about by narrow United States Supreme Court rulings. This section of Gardner’s book is a substantial reproduction of an article he published two years earlier in the Georgetown Law Journal. See James A. Gardner, State Constitutional Rights as Resistance to National Power, 91 Geo. L.J. 1003, 1032-54 (2003).

. Prior to Bowers v. Hardwick, we held that a criminal statute prohibiting opposite-sex sodomy in private violated the federal right of privacy. See State v. Pilcher, 242 N.W.2d 348, 359 (Iowa 1976).

. The leading advocate of this approach was Justice Hans Linde of the Oregon Supreme Court. See Hans A. Linde, Without "Due Process”: Unconstitutional Law in Oregon, 49 Or. L.Rev. 125, 133-35 (1970) [hereinafter Linde].

. See John W. Shaw, Comment, Principled Interpretations of State Constitutional Law— Why Don't the “Primacy” States Practice What They Preach?, 54 U. Pitt. L. Rev. 1019, 1034-49 (1993) (noting, following analysis of Oregon cases, that the Oregon Supreme Court often departs from the primacy approach and offering explanations).

. See Linde, 49 Or. L. Rev. at 135.

. See Brigham City v. Stuart, 547 U.S. 398, 407-08, 126 S.Ct. 1943, 1950, 164 L.Ed.2d 650, 660 (2006) (Stevens, J., concurring); Delaware v. Van Arsdall, 475 U.S. 673, 705, 106 S.Ct. 1431, 1448-49, 89 L.Ed.2d 674, 699 (1986) (Stevens, J., dissenting); Massachusetts v. Upton, 466 U.S. 727, 736-37, 104 S.Ct. 2085, 2089-90, 80 L.Ed.2d 721, 729-30 (1984) (Stevens, J., concurring).

. “Constitutional nationalists” are those who object to citation to foreign law. Daniel A. Farber, The Supreme Court, the Law of Nations, and Citations of Foreign Law: The Lessons of History, 95 Cal. L. Rev. 1335, 1342 (2007).

. This section of Williams's book consists of a substantial reproduction of an article he published in the William and Mary Law Review. See Robert F. Williams, State Courts Adopting Federal Constitutional Doctrine: Case-by-Case Adoptionism or Prospective Lock-stepping, 46 Wm. & Mary L. Rev. 1499, 1520-27 (2005).

. See Tarr at 181 (stating that in a system of dual sovereignty, state courts cannot legitimately delegate responsibility to interpret state constitutional provisions to the United States Supreme Court).

. Many of these state court judges have published thoughtful scholarly articles on independent state constitutional law. See, e.g., Shirley S. Abrahamson, Divided We Stand: State Constitutions in a More Perfect Union, 18 Hastings Const. L.Q. 723 (1991); Shirley S. Abrahamson, Criminal Law and State Constitutions: The Emergence of State Constitutional Law, 63 Tex. L. Rev. 1141 (1985); Shirley S. Abrahamson, Reincarnation of State Courts, 36 Sw. L.J. 951 (1982); Judith S. Kaye, Contributions of State Constitutional Law to the Third Centwy of American Federalism, 13 Vt. L.Rev. 49 (1988); Judith S. Kaye, Dual Constitutionalism in Practice and Principle, 61 St. John's L. Rev. 399 (1987); Hans A. Linde, E Pluribus — Constitutional Theory and State Courts, 18 Ga. L.Rev. 165 (1984); Hans A. Linde, First Things First: Rediscovering the States’ Bills of Rights, 9 U. Balt. L. Rev. 379 (1980); Stanley Mosk, State Constitutionalism: Both Liberal and Conservative, 63 Tex. L. Rev. 1081 (1985); Stewart G. Pollock, Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts, 63 Tex. L. Rev. 977 (1985); Stewart G. Pollock, State Constitutions as Separate Sources of Fundamental Rights, 35 Rutgers L. Rev. 707 (1983); Randall T. Shepard, The Maturing Nature of State Constitution Jurisprudence, 30 Val. U. L. Rev. 421 (1996); Marsha Temus, Remarks: Symposium, Great Women, Great Chiefs, 74 Alb. L. Rev. 1569 (2011); Robert F. Utter, The Practice of Principled Decision-making in State Constitutionalism: Washington’s Experience, 65 Temp. L. Rev. 1153 (1992); Robert F. Utter, Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues Wlten Disposing of Cases on State Constitutional Grounds, 63 Tex. L. Rev. 1025 (1985).

. Of course, the ability to engage in thoughtful, independent analysis of state constitutional issues is threatened when the docket of a state supreme court is unmanageable. As Robert Williams has pointed out, the creation of intermediate courts of appeal in many states has alleviated the workload on state supreme courts and allows for more considered development of the state’s constitutional law. See Robert F. Williams, Introduction: Celebrating Judge Michael Patrick King’s Career, 35 Rutgers LJ. xi, xi-xii (2004). It is undeniable, however, that most state supreme courts do not have the same resources available to it as the United States Supreme Court. The United States Supreme Court decides approximately seventy cases in a nine-month term, with each justice receiving the assistance of four law clerks. In Iowa, we have a somewhat larger caseload and only one law clerk per justice. Nonetheless, with the creation of the Iowa Court of Appeals and the advent of computerized research, our practical ability to meet our Iowa constitutional responsibilities and develop state constitutional law is much enhanced over prior decades.

. Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 758 (1994).

. Craig M. Bradley, Two Models of the Fourth Amendment, 83 Mich. L. Rev. 1468, 1468 (1985).

. Thomas K. Clancy, The Fourth Amendment's Concept of Reasonableness, 2004 Utah L.Rev. 977, 978 (2004).

. Oren S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L. Rev. 503, 504-05 (2007).

. Donald R.C. Pongrace, Stereotypification of the Fourth Amendment’s Public/Private Distinction: An Opportunity for Clarity, 34 Am. U. L. Rev. 1191, 1208 (1985).

. David E. Steinberg, The Uses and Misuses of Fourth Amendment History, 10 U. Pa. J. Const L. 581, 581 (2008).

. Silas J. Wasserstrom & Louis Michael Seidman, The Fourth Amendment as Constitutional Theory, 77 Geo. L.J. 19, 29 (1988).

. Richard G. Wilkins, Defining the "Reasonable Expectation of Privacy": An Emerging Tripartite Analysis, 40 Vand. L. Rev. 1077, 1107(1987).

. Jennifer Friesen, State Courts as Sources of Constitutional Law: How to Become Independently Wealthy, 72 Notre Dame L. Rev. 1065, 1092 (1997).

. Erik G. Luna, Sovereignty and Suspicion, 48 Duke L.J. 787, 787-88 (1999).

. See, e.g., State v. Marsala, 216 Conn. 150, 579 A.2d 58, 59 (1990); Mason v. State, 534 A.2d 242, 254-55 (Del.1987); State v. Guzman, 122 Idaho 981, 842 P.2d 660, 677 (1992); State v. Zanter, 535 N.W.2d 624, 634 (Minn.1995); State v. Canelo, 139 N.H. 376, 653 A.2d 1097, 1105 (1995); State v. Novembrino, 105 N.J. 95, 519 A.2d 820, 857 (1987); State v. Gutierrez, 116 N.M. 431, 863 P.2d 1052, 1066 (1993); People v. Bigelow, 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451, 458 (1985); State v. Carter, 322 N.C. 709, 370 S.E.2d 553, 554 (1988); Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887, 905-06 (1991); State v. Oakes, 157 Vt. 171, 598 A.2d 119, 126-27 (1991); see also 2 Friesen § 11.05[2], at 11-67 to 11-69 & nn. 297-315.

. See, e.g., State v. Jones, 706 P.2d 317, 322 (Alaska 1985); State v. Detroy, 102 Hawai'i 13, 72 P.3d 485, 490, 493-94 (2003); Commonwealth v. Upton, 394 Mass. 363, 476 N.E.2d 548, 556-57 (1985); State v. Cordova, 109 N.M. 211, 784 P.2d 30, 36 (1989); People v. Johnson, 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439, 441, 445 (1985); State v. Worsham, 114 Or.App. 170, 834 P.2d 1033, 1036 (1992); State v. Jacumin, 778 S.W.2d 430, 436 (Tenn.1989); State v. Jackson, 102 Wash.2d 432, 688 P.2d 136, 141 (1984); see also 2 Friesen § 11.05[1][a], at 11-60 to 11-61 &nn. 263-65, 268-71.

. See, e.g., State v. Tanaka, 67 Haw. 658, 701 P.2d 1274, 1276 (1985); State v. Goss, 150 N.H. 46, 834 A.2d 316, 318-19 (2003); State v. Hempele, 120 N.J. 182, 576 A.2d 793, 800-01, 810 (1990); State v. Galloway, 198 Or. App. 585, 109 P.3d 383, 389 (2005); State v. Morris, 165 Vt. 111, 680 A.2d 90, 93-94 (1996); see also 2 Friesen § 11.04[3], at 11-38 to 11-39 & nn. 164-65.

. See, e.g., Charnes v. DiGiacomo, 200 Colo. 94, 612 P.2d 1117, 1120-21 (1980); People v. Jackson, 116 Ill.App.3d 430, 72 Ill.Dec. 153, 452 N.E.2d 85, 89 (1983); State v. McAllister, 184 N.J. 17, 875 A.2d 866, 875 (2005); Commonwealth v. DeJohn, 486 Pa. 32, 403 A.2d 1283, 1289-90 (1979); State v. Thompson, 810 P.2d 415, 418 (Utah 1991); see abo 2 Friesen at 11.04[5], at 11-41 to 42 & nn. 176-79.

. See, e.g., Sitz v. Dep't of State Police, 443 Mich. 744, 506 N.W.2d 209, 223-25 (1993); Ascher v. Comm’r of Pub. Safety, 519 N.W.2d 183, 187 (Minn.1994); see also State v. Henderson, 114 Idaho 293, 756 P.2d 1057, 1063 (1988) (invalidating sobriety checkpoint where police lack express legislative authority, particularized suspicion, and judicial approval on state constitutional grounds prior to United States Supreme Court's decision to uphold them on a general reasonableness standard in Michigan Department of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)); State v. Boyanovsky, 304 Or. 131, 743 P.2d 711, 712 (1987) (invalidating warrantless sobriety roadblock under state constitution prior to United States Supreme Court’s decision in Sitz); Pimental v. Dep’t of Transp., 561 A.2d 1348, 1352 (R.I.1989) (same); City of Seattle v. Mesiani, 110 Wash.2d 454, 755 P.2d 775, 777 (1988) (same); 2 Friesen § 11.09, at 11-110 to 11-112 &n. 479.

. See, e.g., People v. Hill, 929 P.2d 735, 738-39 (Colo.1996); State v. Greenfield, 228 Conn. 62, 634 A.2d 879, 883 (1993); Jones v. State, 745 A.2d 856, 869 (Del.1999); State v. Quino, 74 Haw. 161, 840 P.2d 358, 362 (1992); Commonwealth v. Stoute, 422 Mass. 782, 665 N.E.2d 93, 95-98 (1996); In re Welfare of E.D.J., 502 N.W.2d 779, 783 (Minn.1993); State v. Clayton, 309 Mont. 215, 45 P.3d 30, 34 (2002); State v. Quezada, 141 N.H. 258, 681 A.2d 79, 80-81 (1996); State v. Tucker, 136 N.J. 158, 642 A.2d 401, 405-06 (1994); Commonwealth v. Matos, 543 Pa. 449, 672 A.2d 769, 776 (1996); State v. Randolph, 74 S.W.3d 330, 336-37 (Tenn.2002); State v. Young, 135 Wash.2d 498, 957 P.2d 681, 687-89 (1998); State v. Jones, 193 W.Va. 378, 456 S.E.2d 459, 467 & n. 17 (1995); see also 2 Friesen § 11.010[1], at 11-116 to 11-118 & n. 499.

. See, e.g., State v. Trainor, 83 Hawai'i 250, 925 P.2d 818, 828 (1996); Penick v. State, 440 So.2d 547, 551 (Miss.1983); State v. Carty, 170 N.J. 632, 790 A.2d 903, 907 (2002); Commonwealth v. Cleckley, 558 Pa. 517, 738 A.2d 427, 433 (1999); see also 2 Friesen § 11.012, at 11-147 to 11-148 n. 618.

. See, e.g., People v. Moorman, 369 Ill.App.3d 187, 307 Ill.Dec. 428, 859 N.E.2d 1105, 1116 (2006); State v. Brown, 99 Ohio St.3d 323, 792 N.E.2d 175, 179 (2003); State v. Harris, 916 So.2d 284, 289 (La.Ct.App.2005); Commonwealth v. Gonsalves, 429 Mass. 658, 711 N.E.2d 108, 112 (1999); State v. Askerooth, 681 N.W.2d 353, 363 (Minn.2004); State v. Bauer, 307 Mont. 105, 36 P.3d 892, 895 (2001); State v. Bayard, 119 Nev. 241, 71 P.3d 498, 502 (2003) (per curiam); State v. Bricker, 139 N.M. 513, 134 P.3d 800, 806-08 (N.M.Ct.App.2006); see also 2 Friesen § 11.07, at 11-83 to 11-84 & nn. 372, 375-76; id. § 11.010[3], at 11-140 to 11-141 & n. 588.

. See, e.g., State v. Webb, 130 Idaho 462, 943 P.2d 52, 57 (1997); State v. Bullock, 272 Mont. 361, 901 P.2d 61, 75-76 (1995); People v. Scott, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328, 1337 (1992); State v. Dixson, 307 Or. 195, 766 P.2d 1015, 1024 (1988); State v. Kirchoff, 156 Vt. 1, 587 A.2d 988, 995-96 (1991); see also 2 Friesen § 11.04[1], at 11-34 to 11-37 nn. 147-48, 150-51, 154— 55.

. See, e.g., State v. Wallace, 80 Hawai'i 382, 910 P.2d 695, 705-07 (1996); Moran v. State, 644 N.E.2d 536, 540 (Ind.1994); State v. Campbell, 306 Or. 157, 759 P.2d 1040, 1048-49 (1988); see also 2 Friesen § 11.03[2], at 11-11 to 11-12 nn. 39, 41, 43.